**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Alton SPRADLEN and Joseph Reilly,**
**Defendants-Appellants.**

No. 80–5555
**Non-Argument Calendar.**

United States Court of Appeals,
Eleventh Circuit.

Nov. 23, 1981.

Hy Shapiro, Miami, Fla., for defendants-appellants.

Karen L. Atkinson, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before RONEY, KRAVITCH and CLARK, Circuit Judges.

PER CURIAM:

The appellants, Alton Spradlen and Joseph Reilly, were charged in a two-count indictment with possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and with conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. § 846. In a jury trial, the appellants were acquitted on the possession count but were convicted on the conspiracy count. On this appeal, the appellants claim that the trial judge erred by denying their motion for judgment of acquittal on the conspiracy count because the evidence was insufficient to establish their participation in, or facilitation of, the alleged conspiracy. We are unpersuaded by appellants' arguments and thus affirm their convictions.

The facts are as follows. On December 16, 1979, Sergeant Meeteer of the Delray, Florida, Police Department drove by a residence at 1033 Rhodes Villa in Delray and noticed that the vessel, *Holly M*, which usually was docked behind the residence, was gone. Later that morning, Meeteer observed the *Holly M* proceeding north on the intracoastal waterway heading in the direction of the Rhodes Villa address. Meeteer testified that the *Holly M* was riding low in the water and its engines appeared to be laboring. Meeteer followed the *Holly M* to the Rhodes Villa address, where it docked, and the two men aboard the vessel were met by a third person. A white Chrysler was parked at the house at that time.

At approximately 8:00 p.m. that night, Sergeant Meeteer, along with Officer Ziegler, set up a surveillance on the Rhodes Villa address from a city park located across the street. There was no activity noticed at the Rhodes Villa address from 8:00 p.m. until approximately 12:30 a.m. The agents were positioned so that they could have observed anyone entering or leaving the house. At approximately midnight, Sergeant Meeteer was on his way back to his vehicle when he observed an individual dressed all in black carrying a briefcase in the city park area. He suspected that this individual was engaged in counter-surveillance. He saw the individual a few minutes later, again in the city park, observed that he had a night-vision device, and heard the crackle of a walkie-talkie coming from this individual's area.

The officers left the park and proceeded to a condominium next door known as the Banyon House. From the roof of this building, they established a surveillance of the house. They had an entire overview of the house, including the vessel, the rear of the residence, the roof area of the residence, and the road adjacent to the residence. At this time, they also noticed the same car that Sergeant Meeteer had seen earlier that day at the residence cruising the area with a CB antenna on it. There was no activity at the house until approximately 2:30 a.m., when an individual dressed in black slacks and black t-shirt exited the back of the residence, walked around the backyard, and returned to the residence. The individual did this several times. Approximately an hour later, Sergeant Meeteer, along with Officers Virgadamo and Ziegler, observed the same individual again exit the house, look around the backyard, and board the vessel *Holly M*. Approximately two or three minutes later, another male individual dressed in light

pants with a dark t-shirt exited the residence, went down to the vessel, and began carrying tightly wrapped bundles from the vessel to the house. Sergeant Meeteer watched the individual do this three or four times. He then left the roof area and went to get a search warrant. From the time he began surveillance at approximately 12:30 a.m. until he left between 4:00 and 4:15 a.m., Sergeant Meeteer stated that he saw no one else other than the two individuals enter or leave the residence.

Officer Ziegler testified that he was also on surveillance on the roof of the building and could view the residence at Rhodes Villa from approximately 12:35 a.m. until 5:15 a.m. From 12:35 a.m. until approximately 2:30 a.m., no one entered or left the residence. At approximately 2:30 a.m., an individual dressed all in black scouted the backyard and returned to the residence. At approximately 3:30 a.m., the individual dressed in black boarded the boat and began off-loading burlap bales to an individual in dark shirt and light pants who also exited from the residence. Officer Ziegler watched the entire off-loading which occurred from approximately 3:30 a.m. until 4:45 a.m. During this time, no one was seen at the residence other than the two individuals previously described.

Shortly after 5:00 a.m., Sergeant Meeteer, accompanied by Officer Osleber, returned to the residence with a search warrant. Officer Osleber announced his presence and rang the front doorbell several times. The officers heard movement inside the house. At this point, they broke down the front door with a sledge hammer. Officer Ziegler, with other officers, was in the backyard of the residence and observed the rear door open and a hand come out, at which time a fellow officer announced his presence and the individual inside the house slammed the door and locked it. In a few seconds, two individuals ran from the house into the backyard and were apprehended. These individuals were identified as the defendants Spradlen and Reilly. The agents testified that there was no difference, other than one of the individuals was lacking a shirt, in the dress and physical configura-

tion between these individuals and the individuals he had seen off-loading the vessel.

Officer Osleber testified that when he entered the house at Rhodes Villa and executed the search warrant, there were twenty-seven bales of marijuana in the living room area, two bales in the hallway adjacent to the kitchenette, eighty-one bales in the kitchen area, and one bale in the garage next to a truck. The truck located in the garage had all the windows, except for the windshield, blacked out with black plastic material taped around the windows. Random samples contained in government exhibits were stipulated to by counsel as containing marijuana. The vessel docked behind the residence had marijuana residue on its deck. Approximately one hundred and eleven bales were moved from various areas of the house. Officer Ziegler saw approximately one hundred bales being off-loaded from the vessel.

Officer Osleber also seized, from the kitchen area, a CB base station and CB antenna which was active and on channel 5 when he entered the premises. Next to the CB base station was a police scanner, which was monitoring the police frequency being used by the officers. Adjacent to the scanner was a piece of paper containing sixteen radio frequencies of various law enforcement agencies. Located against the refrigerator, with a flashlight taped over it, was a scale that had a bale of marijuana on it when agents entered the premises. Also found was a master list containing bale numbers and weights. Many of the bales had numbers on them. When comparing a numbered bale with the same numbered bale found on the master sheet, Officer Osleber ascertained that the weight he recorded when he weighed the bale was the same as that recorded for that numbered bale on the master list. The total weight of all the bales was 5,114 pounds.

Prior to leaving the house, appellant Reilly requested that the officers bring him a shirt. He was taken to a bedroom. In the front room was a bag, which Reilly claimed was his and from which he took a shirt.

■ We begin by rejecting the appellants' contention that the conspiracy convictions cannot stand in view of the acquittal on the possession count. Inconsistency in the jury's verdict does not require reversal. "In a multi-count verdict, each count is considered separately, and a guilty verdict upon any count may stand, provided that it is supported by the evidence. *See United States v. Romeros*, 600 F.2d 1104, 1105 (5th Cir. 1979). The disposition of the remaining counts is immaterial to the appellate inquiry." *United States v. Varkonyi*, 611 F.2d 84, 86 (5th Cir. 1980). Thus, our only task here is to determine whether the evidence adduced at trial is sufficient to support the appellants' conspiracy convictions.

■ When reviewing the sufficiency of the evidence supporting a criminal conviction, the standard of review is whether, viewing the evidence and all reasonable inferences derived therefrom in the light most favorable to the government, the jury could conclude that the evidence is inconsistent with every reasonable hypothesis of the defendant's innocence. *United States v. Diaz*, 655 F.2d 580, at 583 (5th Cir. 1981); *United States v. Moreno*, 649 F.2d 309, 312 (5th Cir. 1981); *United States v. Slone*, 601 F.2d 800, 802–03 (5th Cir. 1979); *United States v. Haggins*, 545 F.2d 1009, 1012 (5th Cir. 1977). This standard of review applies to any criminal conviction, including one for conspiracy. *United States v. Malatesta*, 590 F.2d 1379, 1382 (5th Cir.) (en banc), *cert. denied*, 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979).

■ The essential element of a drug conspiracy under 21 U.S.C. § 846 is an agreement by two or more persons to violate the narcotics laws. *United States v. Diaz, supra*, 655 F.2d at 583; *United States v. Ayala*, 643 F.2d 244, 248 (5th Cir. 1981). "The existence of such an agreement may be proved by either direct or circumstantial evidence. The very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *United States v. Ayala*, 643 F.2d at 248,

*citing United States v. Riggins*, 563 F.2d 1264 (5th Cir. 1977), *cert. denied*, 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 150 (1978). "Furthermore, the prosecution need not prove that the accused engaged in 'any overt act in furtherance of the conspiracy.'" *United States v. Diaz, supra*, 655 F.2d at 584 (quoting *United States v. Cardona*, 650 F.2d 54, 57 (5th Cir. 1981)).

■ Appellants argue, and we agree, that "mere presence" is not enough to establish participation in a conspiracy. However, viewing the evidence in the light most favorable to the government, as we must, we believe that a jury reasonably could conclude that the evidence is inconsistent with the theory that the appellants were innocent bystanders who happened to be in the wrong place at the wrong time. The police officers observed two individuals resembling the defendants unload bales from the *Holly M* and then enter the house. The house was observed constantly for over eight hours, and no one entered or exited the house except for those two individuals. The police officers obtained a search warrant and attempted to gain peaceable entry to the house. When no one responded to their knocks on the front door, the officers effected a forcible entry, whereupon the appellants ran from the house and were captured in the yard. A subsequent search of the house revealed numerous bales of marijuana and extensive paraphernalia clearly intended for use in a marijuana distribution scheme. No persons other than the appellants were discovered on the premises. We believe that the evidence is more than sufficient for the jury to have inferred beyond a reasonable doubt that the appellants were engaged in a conspiracy to possess marijuana with the intent to distribute. Therefore, the appellants' convictions are AFFIRMED.