**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Mario BRITO, Eduardo Garcia, Virgil**
**Capote, Defendants-Appellants.**

No. 82–5168.

United States Court of Appeals,
Eleventh Circuit.

Dec. 19, 1983.

Oscar S. Rodriguez, Miami, Fla., for Brito.

R. Jerome Sanford, Joel Kaplan, Miami, Fla., for Capote & Garcia.

Stanley Marcus, U.S. Atty., Samuel J. Smargon, James G. McAdams, III, Asst. U.S. Attys., Miami, Fla., for plaintiff-appellee.

Before VANCE and JOHNSON, Circuit Judges, and PITTMAN *, District Judge.

JOHNSON, Circuit Judge:

On March 4, 1981, a Grand Jury in the Southern District of Florida returned an indictment against the appellants, Eduardo Garcia, Mario Brito, and Virgil Capote, along with nine others, charging them with conspiracy and attempt to import marijuana into the United States in violation of 21 U.S.C.A. §§ 952 and 963. Count I, the conspiracy count, named all three appellants and seven others. Counts II through V, the attempt counts, alleged that various of the indictees participated in a number of failed marijuana importation schemes. Garcia was named in all of these attempt counts; Brito and Capote were named only in count IV. The government dismissed count III, and the district court renumbered counts IV and V as III and IV, respectively.

The appellants were tried before a jury,[1] which found Garcia guilty of conspiracy and one count of attempt and found Brito and Capote guilty only of conspiracy. The court sentenced Garcia to four years' imprison-

---

* Honorable Virgil Pittman, U.S. District Judge for the Southern District of Alabama, sitting by designation.

1. None of the other indictees were tried with the appellants. Six pled guilty, two were unavailable for trial, and the government dismissed the indictment against the remaining defendant.

ment for conspiracy and five years' probation, to commence on his release, for attempt. The court sentenced Brito and Capote each to five years' imprisonment; it ordered each to serve six months in prison, the remainder of the sentence to be suspended, to be followed by a five-year term of probation.

Collectively, Garcia, Brito, and Capote raise three issues on appeal. First, all three claim that there existed a prejudicial variance between the evidence offered at trial and the indictment in that the indictment alleged a single conspiracy and the evidence proved the existence of several independent conspiracies. Second, Garcia claims that he was denied a fair trial because the government failed to disclose the whereabouts of a confidential informant. Finally, Capote claims that his conviction for conspiracy is invalid because it is inconsistent with his acquittal on the underlying attempt charge. We reject all three claims and affirm the convictions.

FACTS

The appellants' convictions were the product of a two-year DEA undercover operation code-named "Grouper." Beginning in 1978, DEA agents Theodore Weed and Pete Sarron represented themselves as marijuana offloaders who, for a substantial price, would meet "motherships" carrying large hauls of marijuana from Colombia, South America, at prearranged spots in the eastern Bahamas and would offload and transport the marijuana to a point in the western Bahamas. There they would deliver the cargo to the wholesale purchaser for final run into the United States. The agents claimed to have bribed Bahamian authorities so that they could carry on their operation with impunity.

The agents' initial contact was Thomas Mallos, a nightclub owner in Freeport, Grand Bahama, who served as a confidential informant. Mallos introduced the agents to Gus Barres on October 19, 1978. Barres discussed employing the agents to offload a 30,000 pound cargo of marijuana that was sailing to the Bahamas aboard an 80-foot tug, the DELMAR. Weed informed the Coast Guard of the approach of the DELMAR, and the Coast Guard seized the vessel. This seizure created a severe economic setback for Barres, who attempted to recoup his losses by acting as a broker, introducing transporters and wholesalers of marijuana to the agents. On December 6, 1978, Barres met with the agents to discuss the offloading of a tanker, the MINI I, which would soon be arriving in the Bahamas carrying a large load of marijuana.

Meanwhile, appellant Garcia had approached a DEA informant named Harrison in late September 1978 about piloting the MINI I from Aruba, Colombia, to the Bahamas. Acting on Harrison's tip, the Coast Guard intercepted the vessel in late December. This incident served as the basis for count II.

In July 1979, Barres introduced Weed to Garcia to discuss the possibility of the agent's offloading a large quantity of marijuana from a ship called the ANNA MARIE CLARK. Garcia and Weed met again in August, and, on August 13, Barres informed Weed that the departure of the ANNA MARIE CLARK from Colombia would be delayed. On September 17, Barres introduced Weed to appellant Capote and "Felo" Sanchez to discuss the ANNA MARIE CLARK operation. Capote described the boat and the size of the load, and generally conducted negotiations with Weed on behalf of the conspirators. In a series of meetings from mid-September to late January, Weed met with Barres, Capote and others to discuss the details of the operation. Apparent difficulties in obtaining a supply of marijuana continued to delay the departure of the ANNA MARIE CLARK. The principals soon made it clear to Weed that the shipment of marijuana was to be split between two groups, one represented by Capote and the other by Antonio Canaves. On February 1, 1980, Capote introduced Weed to appellant Brito, saying that Brito was "one of us." Barres told Weed that Brito had arranged the purchase of marijuana in Colombia for the two groups. On February 4, Brito, with other members of the Capote group, met with

Weed and gave him $5,000 which Weed was to use to bribe a Bahamian official. On February 7, on the basis of information provided by Weed, the Coast Guard seized the ANNA MARIE CLARK. This episode served as the basis for the renumbered count III.

In mid-February, Barres approached Weed about offloading a marijuana haul that was to arrive on a sailing ship called the FENICIO. Weed met with Pedro Suarez, a member of the Canaves group, and Fidel Lorenzo, described as a partner of Garcia, to discuss the details. In the course of these meetings, the conspirators made clear that Garcia was organizing the transport of the marijuana aboard the FENICIO. When the shipment arrived, Weed offloaded the marijuana into his boat, the MELODY. By prearrangement, as the marijuana-filled MELODY came in, the Bahamian police arrived at the dock with a search warrant and "arrested" Weed. These events were the basis for the renumbered count IV.

In March 1980, Weed met with Barres, Brito, and others who had participated in the failed ANNA MARIE CLARK operation to discuss a large cargo of marijuana that would be coming in from Colombia to Louisiana. Brito had apparently been in Colombia arranging the purchase. On March 21, Barres called Weed to tell him that Garcia had organized a new group for the purpose of bringing a shipment of marijuana into Louisiana. Subsequently, Weed met with Barres and Garcia to discuss the project. At one point in these conversations Garcia related his participation in the FENICIO venture.

1. *Prejudicial Variance Between the Evidence and the Indictment*

All three appellants claim that these facts establish the existence of multiple conspiracies, not a single conspiracy as the jury found and the indictment charged. They claim that each of the attempts to import cargoes of marijuana constituted an individual conspiracy and that the collectivity of the various marijuana importation ventures is not in the pattern of any of the well-known models of a single conspiracy.

■ To prove the existence of a conspiracy, the government must show an agreement or common purpose to violate the law. *United States v. Watson,* 669 F.2d 1374, 1379 (11th Cir.1982); *United States v. Michel,* 588 F.2d 986, 994 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 82 (1979).[2] Each individual defendant must have joined the conspiracy intentionally, *United States v. Becker,* 569 F.2d 951, 961 (5th Cir.), *cert. denied,* 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978), although the individual need not be privy to all the details of the conspiracy, *id.,* or be aware of all the other conspirators, or participate in every stage of the conspiracy. *Watson,* 669 F.2d at 1379.

■ Conspirators invite mass trials by their conduct. *United States v. Perez,* 489 F.2d 51, 65 (5th Cir.1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). Nevertheless, fairness demands that alleged conspirators not be tried alongside the perpetrators of a wholly separate criminal scheme. In *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), the Supreme Court held that, where the evidence at trial proves the existence of multiple, independent conspiracies and the indictment alleges a single conspiracy, reversal of the defendants' conspiracy convictions is warranted if the defendants' substantial rights have been injured by the variance.

The necessity for drawing this distinction derives from our interest, clearly our duty, in jealously protecting those accused from the possible transference of guilt of others accused, at least in the eyes and minds of a jury, which so often is claimed to be encountered where en

---

**2.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent the deci-

sions of the Fifth Circuit rendered prior to October 1, 1981.

masse prosecutions are undertaken for a conglomeration of separate offenses. *Perez, supra,* 489 F.2d at 57. In *Kotteakos* the Supreme Court likened the alleged conspiracy to a wheel. The central actors, who were involved in each of the separate criminal enterprises, were analogous to the wheel's hub. The various criminal undertakings in which they participated represented the spokes. The Court could find no "rim" enclosing these spokes, that is, no circumstances which bound the separate conspiracies together and made them one. In such a case, the Court held, it is improper to try the members of many separate conspiracies en masse. A year later, the Court endorsed another analogy in *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947). That case involved a criminal distribution network. The Court concluded that, although this conspiracy could not be fit into the wheel model, it was nevertheless a single conspiracy. The Court compared the distribution network to a chain. Each link was necessary to carry out the conspiracy's ultimate objectives, and even though each conspirator may not have dealt with or even known other conspirators down the line of distribution, each must have known that someone else was fulfilling these necessary functions.

■ The appellants urge that the evidence adduced at their trial did not demonstrate the existence of either a wheel or a chain conspiracy. Our precedent recognizes that, although the wheel and chain models can be helpful in analyzing the structure of a conspiracy, they do not define the universe of criminal conspiracies. *See United States v. Perez, supra,* 489 F.2d at 64. The question we must ask is not whether the conspiracy resembled a functional wheel or an unbroken length of chain but "what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, then it is one conspiracy." *Id.* at 62. In reviewing the evidence to determine whether it supports the jury's verdict that a single conspiracy existed, we examine three factors: (1) whether a common

goal existed, (2) the nature of the criminal scheme, and (3) the overlapping of the participants in the various dealings of the conspiracy. *United States v. Watson, supra,* 669 F.2d at 1379–80; *United States v. Tilton,* 610 F.2d 302, 307 (5th Cir.1980); *United States v. Becker, supra,* 569 F.2d at 960. The scope of our review is narrow. Whether there was one or were more conspiracies is a question for the jury. *Michel, supra,* 588 F.2d at 995; *United States v. Rodriguez,* 509 F.2d 1342, 1348 (5th Cir.1975). We may reverse a jury's finding that a single conspiracy existed only if the evidence, viewed in the light most favorable to the government, could not permit reasonable jurors to have found, beyond a reasonable doubt, that there was a single conspiracy. *United States v. Bell,* 678 F.2d 547, 549 (5th Cir. Unit B 1982) (en banc).

■ Reviewing the evidence as it relates to the factors listed above, we conclude that there was sufficient support for the jury's conclusion that the appellants were involved in one multi-faceted conspiracy. The conspirators had as their common objective importation of marijuana into the United States. *See United States v. Watson, supra,* 669 F.2d at 1380. Several aspects of the nature of the conspiracy suggest a single, ongoing operation. The evidence indicates that Garcia operated an ongoing business dedicated to purchasing large loads of marijuana in Colombia, transporting them to the Bahamas aboard "motherships," and delivering them to Weed and the other DEA agents on behalf of various groups of wholesalers. The marijuana would then be handed over to the wholesalers who had been involved in each operation from the beginning. Although the identities of the wholesalers differed somewhat from load to load, each clearly knew of the scope of the illegal enterprise and knew of and even worked with other wholesalers. A single conspiracy exists where the "agreement ... contemplates that the activity will be repeated sometimes with, sometimes not, the same actors." *Perez, supra,* 489 F.2d at 62. Finally, there was a considerable amount of overlap

among the participants of the different ventures. Five separate importation plans are discernable: the DELMAR, the MINI I, the ANNA MARIE CLARK, the FENICIO, and the proposed Louisiana drop. Appellant Garcia had some part in all five; Gus Barres had a role in at least four; Fidel Lorenzo was involved in at least three; Pedro Suarez, Felo Sanchez, appellant Brito, and Juaquin Collazo all participated in at least two of the schemes. Taken as a whole, the evidence at trial provided sufficient support for the jury's finding that a single conspiracy existed.

Even if the evidence did show that multiple conspiracies existed, before we could reverse their convictions the appellants would have to demonstrate that the variance between the indictment and the evidence adversely affected their substantial rights. *United States v. Tilton, supra,* 610 F.2d at 307; *United States v. Canales,* 596 F.2d 664, 670 (5th Cir.1979). This they have failed to do. The appellants point to no specific prejudice; they argue generally that their trial en masse exposed them to the danger of a spill-over effect which prevented the jury from considering each defendant's guilt individually based on the evidence against him. In evaluating such claims, an important factor is the "number of defendants tried and the number of conspiracies proven," for the more of each the greater is the danger of prejudice. *United States v. Solomon,* 686 F.2d 863, 870 (11th Cir.1982). We have recently rejected a claim of prejudice where

> [a]t trial there were only three defendants and the evidence as to each was clear and distinct. There were only six thefts and the evidence was clear as to the time of each theft and the goods stolen and sold.

*Id.* at 871. We concluded that in such a case the danger that the jury would transfer guilt from one defendant to another is minimal. The present case is similar. Only three defendants were on trial, and the government presented evidence of only five importation attempts. There was no confusion about which of the defendants was involved in which of the incidents. As in *Solomon,* the jury in this case should have been able to consider each defendant's guilt individually.

2. *The Government's Failure to Divulge the Whereabouts of a Confidential Informant*

On the first day of trial, counsel for appellant Garcia moved the court to order the government to produce Thomas Mallos, the informant who had introduced the agents to Gus Barres. The court initially reserved ruling on the motion and later denied it on the ground that Garcia had shown no need for Mallos's testimony. Several days later, after Garcia testified on direct examination that Mallos had been present when Garcia and Weed were introduced, the court granted Garcia's renewed motion that the government produce Mallos. The government informed the court that Mallos had left the country to visit his sick mother in Greece, but that it would try to locate him. The government was unable to do so.

 Garcia points to *Ashley v. Wainwright,* 639 F.2d 258, 261 (5th Cir. Unit B 1981), for the proposition that, where a defendant has requested that the government serve compulsory process on an informant and where the prosecution is negligent in failing to discover the whereabouts of the informant, the negligent concealment constitutes a violation of fundamental fairness. *See also Roviaro v. United States,* 353 U.S. 53, 60–61, 77 S.Ct. 623, 627–628, 1 L.Ed.2d 639 (1957) (government must disclose the identity and whereabouts of a confidential informant if his identity or the content of his communication "is relevant and helpful to the defense of an accused"). Garcia's reliance on *Ashley* is misplaced. The Court in *Ashley* expressly withheld judgment on the question whether negligent concealment of a confidential informant violates a defendant's Sixth Amendment right to compulsory process of witnesses. 639 F.2d at 261. Even if it were the law that negligent concealment violates the Sixth Amendment, the government's conduct in this case was clearly not negligent. As soon as the court ordered the

prosecution to reveal Mallos's whereabouts, the government began searching for him. Garcia's claim that the government should have begun its search after the district court denied the initial motion to disclose but before it reversed itself and ordered disclosure is meritless and rings hollow in light of the fact that Garcia waited until the first day of trial to present the motion even though he knew Mallos's identity and was aware of his presence at certain meetings between Garcia and Weed long before.[3]

### 3. Inconsistent Verdicts

Appellant Capote claims that he was first persuaded to join the conspiracy on September 17, 1979, when Barres introduced him and Felo Sanchez to Weed. Capote testified that at that time his daughter was suffering from birth defects that required her to be flown to France for treatment. He testified that when he told Weed of his situation, Weed replied that Capote's cut from the ANNA MARIE CLARK deal would be his chance to take his daughter to France. Capote claims that at that point he decided to join the conspiracy. Capote argued at trial that Weed's behavior amounted to entrapment, and the district court gave an entrapment instruction. The jury acquitted Capote of attempt but convicted him of conspiracy to import marijuana. Capote urges that the acquittal on the underlying attempt count must have been based on his entrapment defense, and that the two verdicts are therefore inconsistent and his conspiracy conviction should be reversed.

We begin with the proposition that inconsistency in a jury's verdict does not require reversal. *United States v. Mulherin,* 710 F.2d 731, 736 (11th Cir.1983), *modified,* No. 81–8025 (Nov. 21, 1983); *United States v. Spradlen,* 662 F.2d 724, 727 (11th Cir.1981); *United States v. Varkonyi,* 611 F.2d 84, 86 (5th Cir.), *cert. denied,* 446

U.S. 945, 100 S.Ct. 2173, 64 L.Ed.2d 801 (1980); *United States v. Romeros,* 600 F.2d 1104, 1105 (5th Cir.1979), *cert. denied,* 444 U.S. 1077, 100 S.Ct. 1025, 62 L.Ed.2d 759 (1980). This is true even where the jury convicts a defendant of conspiracy to commit an underlying substantive offense but finds the defendant not guilty of committing the underlying offense. We explained the proper analysis in such cases in *United States v. Spradlen, supra,* 662 F.2d at 727:

We begin by rejecting the appellants' contention that the conspiracy conviction cannot stand in view of the acquittal on the possession count. Inconsistency in the jury's verdict does not require reversal. "In a multi-count verdict, each count is considered separately, and a guilty verdict upon any count may stand, provided that it is supported by the evidence.... The disposition of the remaining counts is immaterial to the appellate inquiry." ... Thus, our only task here is to determine whether the evidence adduced at trial is sufficient to support the appellants' conspiracy convictions.

(citations omitted). Capote urges that we endorsed a broader standard of review in *United States v. Caro,* 569 F.2d 411 (5th Cir.1978). He is incorrect. In *Caro* the Court stated that

[t]here is nothing necessarily inconsistent, in law or logic, with such a result and we do not hold that a conviction for conspiracy and acquittal of the substantive offense may never properly arise from the same facts and trial. We do suggest however, that such a result should engage our judicial skepticism. A critical analysis of the facts is required when such a contrariety of results does appear.

*Id.* at 418. These comments do not establish a standard of review. They merely point out that inconsistent verdicts in conspiracy cases can be analytically troubling,

---

**3.** Garcia's failure to make this motion before trial is sufficient reason to deny his claim. *United States v. Diaz,* 655 F.2d 580, 586 (5th Cir. Unit B 1981), *cert. denied,* 455 U.S. 910, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982). In *Diaz* we also held that where, as here, the informant

was merely an "introducer" who then simply observed the negotiations between the undercover agents and the defendant, the informant's role in the illegal activity was insufficient to justify requiring the government to produce him. *Id.* at 588.

and that when such verdicts occur this Court should give particular attention to its review of the sufficiency of the evidence. As our later decision in *Spradlen* indicates, however, "our only task here is to determine whether the evidence adduced at trial is sufficient to support the appellants' conspiracy convictions." *Spradlen, supra.* Our review of the sufficiency of the evidence is limited to determining whether the evidence, viewed in the light most favorable to the government, permitted reasonable jurors to have found guilt beyond a reasonable doubt. *United States v. Bell, supra.*

We conclude, after reviewing the trial record, that the evidence amply supported Capote's conviction of conspiracy. The evidence of entrapment did not require the jury to acquit on that ground. "For entrapment to exist, the criminal design must originate with government officials, and it is they who must plant the criminal design in the mind of an innocent man." *United States v. Lee,* 694 F.2d 649, 653 (11th Cir.1983). The focus of an entrapment inquiry must be whether or not the defendant was predisposed to commit the crime. *United States v. Bagnell,* 679 F.2d 826, 834 (11th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983). A reasonable jury could clearly have found that the agents did not plant the criminal design in Capote's mind and that Capote was predisposed to join the conspiracy. Capote came to the agents with the criminal plan. Capote was associated with the conspirators before he ever met Weed. Far from being a wavering hanger-on, Capote took a substantial role from the start in negotiating the terms of the agreement with the agents. Capote's argument that his conviction is not supported by the evidence is meritless.

For the above reasons we AFFIRM the decision of the district court.