UNITED STATES of America,
Plaintiff-Appellee,

v.

Cecil W. ELLEDGE, and Wayne Anthony
Poole, Defendants-Appellants.

No. 82–7327.

United States Court of Appeals,
Eleventh Circuit.

Jan. 27, 1984.

David C. Johnson, Birmingham, Ala., for Elledge.

Hiram Dodd, Jr., Birmingham, Ala., for Poole.

Michael V. Rasmussen, Asst. U.S. Atty., Birmingham, Ala., for plaintiff-appellee.

Before GODBOLD, Chief Judge, RONEY and SMITH *, Circuit Judges.

RONEY, Circuit Judge:

Cecil W. Elledge and Wayne Anthony Poole were convicted in a jury trial of conspiracy to import marijuana and conspiracy to possess with intent to distribute marijuana. 21 U.S.C.A. §§ 963, 846. The defendants claim there was insufficient evidence to support their convictions and that the district court committed reversible error by admitting evidence of a death threat made to a government witness. After a careful review of the trial record and the recorded conversations and meetings, we affirm.

To establish the existence of a drug conspiracy, the government must prove an agreement by two or more persons to violate the narcotics laws. *United States v. Blasco,* 702 F.2d 1315, 1330 (11th Cir. 1983); *United States v. Cuni,* 689 F.2d 1353, 1356 (11th Cir.1983). The existence of a conspiratorial agreement may be established through circumstantial evidence, such as "inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *Blasco,* 702 F.2d at

* Honorable Edward S. Smith, U.S. Circuit Judge for the Federal Circuit, sitting by designation.

866

1330 (quoting *United States v. Spradlen,* 662 F.2d 724, 727 (11th Cir.1981)). "Proof is not required that the defendant had knowledge of all the details of the conspiracy; the defendant need only have knowledge of the essential objective of the conspiracy." *United States v. Tomargo,* 672 F.2d 887, 889 (11th Cir.), *cert. denied,* 459 U.S. 864, 103 S.Ct. 141, 74 L.Ed.2d 119 (1982); *United States v. Alvarez,* 625 F.2d 1196, 1198 (5th Cir.1980) (en banc), *cert. denied,* 451 U.S. 938, 101 S.Ct. 2017, 68 L.Ed.2d 324 (1981).

■ Unlike in other conspiracy cases, the government need not prove any overt act in furtherance of a conspiracy under the Comprehensive Drug Abuse Prevention and Control Act of 1970, including 21 U.S.C.A. § 846 (conspiracy to distribute) and § 963 (conspiracy to import). *Blasco,* 702 F.2d at 1330 (§ 846); *United States v. Thomas,* 567 F.2d 638 (5th Cir.) (§ 963), *cert. denied,* 439 U.S. 822, 99 S.Ct. 90, 58 L.Ed.2d 114 (1978). In this case, therefore, the government had to establish only that a conspiracy existed, that each defendant knew at least the essential objectives of the conspiracy, and that each defendant voluntarily participated in it. *Blasco,* 702 F.2d at 1330; *United States v. Middlebrooks,* 618 F.2d 273, 278 (5th Cir.), *modified on other grounds,* 624 F.2d 36 (5th Cir.), *cert. denied,* 449 U.S. 984, 101 S.Ct. 401, 66 L.Ed.2d 246 (1980).

The defendants argue that although there was a great deal of conversation about drugs, those discussions were only preliminary to, and did not result in, any final criminal agreement to import and distribute marijuana. We examine the evidence here in some detail to see whether there was evidence of a conspiracy or only evidence of preliminary discussions without any illegal agreement.

■ The prosecution was based almost entirely upon recorded conversations between the defendants and an associate, who began working in a undercover capacity for the Federal Bureau of Investigation. The informer had numerous conversations with Elledge, and met with both Elledge and Poole at an airport to talk with a prospective pilot about the importation. The conversations between Elledge and the informer cannot form the conspiracy because it takes at least two to conspire, neither being a government agent or informer. *United States v. Tombrello,* 666 F.2d 485, 490 n. 3 (11th Cir.), *cert. denied,* 456 U.S. 994, 102 S.Ct. 2279, 73 L.Ed.2d 1291 (1982); *United States v. Martino,* 648 F.2d 367, 405 (5th Cir.1981). The conversations could, however, be evidence of a conspiracy between Elledge and Poole.

Cecil Elledge was an attorney in Birmingham, Alabama. His friend Wendell Dowdy had introduced him to Wayne Poole, a marijuana dealer. Sometime prior to the conspiracy here alleged, Poole and Elledge had been involved in an attempt to smuggle marijuana into the country by plane. That plan failed because the plane broke down and the pilot backed out.

In March, 1982, Elledge asked one of his clients if he would like to earn some money by finding an aircraft to be used to haul flowers. The client located several planes, but Elledge rejected them, emphasizing the need for a plane with a large payload and short take-off and landing capabilities. The client told Elledge that it appeared he was looking for a "dope" plane. Elledge acknowledged that he was, and offered the client part of the payload if the client could find a suitable aircraft.

The client reported these conversations to the Federal Bureau of Investigation. He agreed to continue his contacts with Elledge and to use a recording device. He testified in this trial. Working as an undercover informer, he returned to Elledge's office. They discussed the routes an aircraft could take through the Caribbean and the Gulf of Mexico, and Elledge pointed out some areas that were patrolled. Elledge assured the informer that the people for whom the plane was being sought did not know the informer's name. Elledge stated, "The ones that are running it are right here ..." and "... we're supposed to be ready to go." Elledge stated that he and the informer "were going to do it for a percentage of it...."

The informer then said he might have found a plane, a DC–3, and a pilot who would be willing to fly it for a fixed price depending "on how much we're hauling. . . ." Elledge said they would be hauling a "plane load", and told the informer to ask the pilot how much money he wanted. Asked when the flight would be, Elledge said, "Soon." Elledge said the pilot would have a one-day notice before he was to take off. The marijuana would be waiting for him at an airport in South America. The pilot would be paid a certain amount down and the remainder after some of the marijuana had been sold. Elledge said they already had guards. Elledge stated, "This is the best deal here . . . the pilot with a plane. That's what we've been looking for." Elledge then talked about future deals where other partners would not have to be included. At the end of the conversation, Elledge said he would "start calling my folks." He called a "Wayne," who was not there, and then told the informer, "My man's over there talking to 'em now."

Later, when the informer returned to Elledge's office, Elledge called "Wayne" and said over the telephone, "300 and then you gotta worry about trying to get rid of it up here . . . Well, we got to get us a plane load, that is all there is to it." The informer said the pilot and plane were available. Elledge replied, "The sooner we get it set up, that's the man we want."

Elledge discussed the possibility of going to Colombia, South America to find their own source for future deals. Elledge said he was ready to do the current deal, but the people financing the scheme were scared because of some event in Montgomery. Elledge said he had the distribution network set up. He mentioned that Dowdy was "one of the three sponsoring us." Elledge indicated the marijuana would be dropped off in Blount County.

In a telephone call later that day, Elledge and the informer again discussed their plans to fly to Colombia to find their own source. Regarding the current deal, the informer reported that the pilot would be available on short notice. Elledge stated:

"Now if I can just get these guys to do something . . . I mean if they could just fall in place tonight or maybe tomorrow . . . we'd be ready to go," but that if nothing else came through they could set up their own "run" and make a lot more money.

The informer called Elledge on April 13, 1982, reporting that the pilot wanted $60,-000 for his services, and that the pilot could obtain his own marijuana source. Elledge told the informer to "tell 'em we'll talk to him" and to call Elledge the next day. When called the next day, Elledge said he had been "talking to the man." Elledge asked if the pilot could bring the "eagle" in the next week so "they" could look at it.

Two days later, the informer went to Elledge's office and they discussed a plan to give the pilot $60,000 in three installments. After calling Dowdy, Elledge said that the biggest problem was coming up with the cash.

Later that day, the informer returned to Elledge's office and said he had talked to the pilot and that the offer was "generally acceptable." Elledge said Dowdy was the one he would have to see about the money. He cautioned the informer not to let anyone know Elledge's name. They discussed the profits they would make ($300,000 for Elledge and the informer, with the remaining proceeds going to the other participants).

On April 22, 1982, the informer went to Elledge's office. Elledge said the sponsors were trying to get the money and that they were "converting some stuff into cash money." Told that the pilot and the plane would be ready the next day, Elledge said, "We'll all go to the plane . . ." and then talk to the pilot, and that the pilot should be ready to make the trip to Colombia the following day. The informer was to call Elledge when the pilot arrived.

The next day, April 23, 1982, Elledge was told that the pilot was to land at noon. Around noon, Elledge and the informer met at the airport. Elledge called someone else to meet him, and after hanging up, he told the informer that the other person "can't get away right now, he said anything I thought was good enough for him." Wayne

Poole then arrived at the airport, and the three of them discussed the pilot's arrival. Elledge and Poole talked about getting loads of their own, and discussed the aircraft. Poole said he had dealers who could move the product.

The pilot (a Drug Enforcement Agency undercover pilot) then arrived, in a small aircraft rather than in the expected DC–3. Elledge asked the pilot about the cost of cocaine. Elledge said they were looking for the pilot to provide "straight transportation." Elledge and Poole said the marijuana would come from a town called Monterey. Poole said he was already set up to distribute the marijuana: "I can move 3,000 pounds of reefer a month, myself."

The pilot offered to provide marijuana for $420,000 and the aircraft for $60,000. Elledge and Poole said they would use their own source. The pilot said the aircraft alone would cost Poole and Elledge $100,-000. Poole asked if the pilot could do it for less, or if he could wait for the second installment of $70,000, but the pilot said he could not. They then discussed cocaine. Elledge acknowledged he had been in contact with Poole's source, who had quoted a price for cocaine. The pilot asked if they wanted to do a marijuana deal or a cocaine deal, and Elledge replied, "We're gonna do the grass deal first."

Elledge mentioned that they were going to talk to the "big man." As the meeting ended, the pilot told Elledge and Poole to get together with their man and set something up. Elledge responded ". . . All right they're gonna go one way or the other." After the meeting with the pilot ended, Elledge and Poole drove their cars to Dowdy's place of business. The informer contacted Elledge on April 24, and Elledge said "They're just checking some prices," and "I got to get the best price they can get, they said." Later, Elledge told the informer that the sponsors backed out. "They just left us hanging. Me and Wayne and the other man. So they're just working on something else . . . til they can find somebody else with some money."

Elledge argues that these facts show only preliminary discussions which did not result in any finalized criminal agreement or conspiracy. He focuses on the absence of certain "requisites of a marijuana importation and distribution plan," such as "a source for the marijuana, security for the operation, a place to land or drop off the marijuana, a distribution system and financial backers." It appears that these elements of the plan were at best uncertain. A number of countries and cities were discussed as possible sources, and it was never clear who the "connection" would be. No security guards had actually been arranged, although Elledge and Poole discussed them briefly at the airport meeting. There was no evidence concerning exactly where the marijuana would be picked up. Both Elledge and Poole mentioned possible distribution schemes through dealers, and Poole mentioned "moving" it himself. Although Elledge talked about financial backers, he never gave the informer any money. The alleged conspirators met at the airport and talked to a prospective pilot, but never made final arrangements with the pilot to have the drugs imported.

 This argument misunderstands the law in this Circuit. A complete detailed agreement is not necessary to convict persons of conspiracy. Although the precise arrangements for the importation were never finalized in this case, certainty as to the source, financial backers, security, distribution system and pickup and landing points are not necessary for a conviction under 21 U.S.C.A. § 963. In *United States v. Thomas*, 567 F.2d 638 (5th Cir.), *cert. denied*, 439 U.S. 822, 99 S.Ct. 90, 58 L.Ed.2d 114 (1978), the defendants were convicted of conspiracy based solely upon meetings and conversations with undercover Drug Enforcement Administration informers. The defendants in *Thomas* met with the informers and discussed narcotics transactions, and boasted about their smuggling organizations. An airline ticket to Honduras possibly belonging to one of the conspirators was introduced. Another conspirator said he could obtain transportation for the shipment, and asked about the size of the

airfield in Colombia and the availability of fuel. Expense money was requested, but none was given. Tentative commissions for the smuggling operation were discussed. The Court stated: "Other than an agreement that sometime in the future the defendants would import some cocaine no act of illegality was established." 567 F.2d at 640. "[W]e look upon this as a most unusual case. There were many meetings and much talk—a lot of smoke and no fire." 567 F.2d at 641. The court concluded that there was "an abundance of evidence from which a jury could believe beyond a reasonable doubt that the defendants did indeed unlawfully conspire, although they may have taken no action to execute the conspiracy." *Id.*

In *United States v. Grassi,* 616 F.2d 1295, 1302 (5th Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 220 (1980), Grassi was convicted of conspiracy to import marijuana even though the agreement to do so was conditional:

> Grassi does not deny that he was a full participant in the planning of the marijuana importation, but he argues that discussions of the scheme were only preliminary to, and did not result in, a final criminal agreement. It is true that the importation was to occur only if Ammirato and Grassi became satisfied that they were not dealing with police, but such a proviso is like any condition in an agreement. That the agreement was subject to a condition does not make it any less an agreement.
>
> At the time of his arrest, Grassi had agreed in principle to the undertaking, and together with Ammirato he had begun to negotiate the details of the plan and to discuss the necessary preparations. From this, the jury could find that Grassi had conspired to import marijuana.

616 F.2d at 1302.

■ Elledge, like the defendant in *Grassi,* had agreed to the undertaking in principle, and had begun to discuss the details of the scheme. A reasonable jury could conclude that Elledge knowingly participated in a conspiracy to import and dis-

tribute marijuana. Elledge (1) asked his client to obtain a suitable aircraft, (2) determined that they wanted to have a "plane load", (3) said the marijuana would be waiting at an airport, (4) discussed arrangements for paying the pilot, (5) contacted financial backers, (6) said the distribution network was set up, (7) discussed the profits from the venture, (8) asked to meet with the pilot, (9) participated in the airport meeting with the pilot, and (10) told the pilot they would be doing the "grass deal first." That the plan was not ultimately completed or executed does not negate the crime of conspiracy. *United States v. Cuni,* 689 F.2d 1353, 1356 (11th Cir.1982) (whether object of conspiracy is achieved is immaterial).

■ Elledge also argues that there was insufficient evidence of his intent to enter the conspiracy, that he was merely "puffing" when he held himself out as a conspirator. This argument is based upon Elledge's own testimony that he was conducting a secret investigation on his own, and the fact that he failed to do several things he told the informer he would do. Elledge's credibility was a question for the jury, and the jury could choose to disregard his testimony even if it was not contradicted. *Hawk v. Olson,* 326 U.S. 271, 279, 66 S.Ct. 116, 120, 90 L.Ed. 61 (1945); *United States v. Trull,* 581 F.2d 551, 552 (5th Cir. 1978). Any conflict in the evidence regarding the sincerity of Elledge's participation in the conspiracy was a question of fact for the jury.

■ The evidence concerning Poole shows that he (1) was telephoned by Elledge regarding the deal before the airport meeting, (2) met with Elledge, the informer and the pilot at the airport, (3) said he had dealers who could move the drugs, (4) thought that Monterey was the source for the marijuana in this deal, (5) discussed financial arrangements with the pilot, and (6) went to Dowdy's place of business, as did Elledge, after the airport meeting. This was sufficient evidence for the jury to infer that Poole was a participant in the conspiracy.

Elledge argues that the trial court abused its discretion by admitting evidence concerning a threat against the undercover informer. There was no reversible error. Throughout the trial, Elledge attacked the informer's credibility, and tried to show that the informer's testimony and cooperation had been bought by the government. On cross-examination, Elledge asked the informer to tell the jury how much the government was paying him to testify. The informer answered that he had received money from the government only for reimbursement and protection, not for his testimony.

Q: Was that money in exchange for your testimony?

A: No, sir. It was in exchange for reimbursing my expenses.

Q: I see. Have you received money from the Government for apartment rent?

A: That's part of my expenses, yes, sir. They moved me out of town, because my life was threatened.

MR. JOHNSON: We asked that be excluded. There absolutely no—that is the first time that I have ever heard of that or anything of that nature, and I ask that it be excluded and ask the jury to disregard it and ask for a mistrial.

THE COURT: Ladies and gentlemen, that testimony should not be considered by you, and it is excluded and should not be considered by you in any way.

Elledge, however, continued to question the informer regarding the threats:

Q: You are not telling the the ladies and gentlemen of the jury, are you, that in one of those [taped] conversations, your life was threatened?

A: Not in that.

Q: One of those taped conversations?

A: No. But there were several references to people being killed in the tapes . . .

Q: You are not suggesting—

A: My life was not threatened personally in the tapes that—in the recordings that I had with Cecil Elledge.

Q: Those are the only conversations you had with Mr. Elledge, aren't they, other than the ones that you had with him before you went to the FBI?

MR. RASMUSSEN: Your Honor, we'll stipulate that we have no evidence of Mr. Elledge making any threats, if that helps.

THE COURT: All right.

Q: Now, getting back to how much you have been paid, you say you have been paid to reimburse your expenses?

A: That's correct. . . .

Q: Seventeen hundred dollars; is that right?

A: I don't know the figure offhand.

Q: And you say that you moved to Montgomery, and I suppose that now your testimony is you moved to Montgomery because you were afraid of your life, for your life?

A: That's correct.

Q: So, Mr. Elledge has not threatened you, has he?

A: To my knowledge, no.

Q: And neither has Mr. Poole?

A: To my knowledge, no.

Elledge then elicited testimony that the government reimbursed the informer for leasing a car, suggesting that the car payments were in exchange for the informer's testimony.

On redirect examination, the prosecutor sought to explain why the informer was provided with another car. The informer testified that in July, 1982, his car had been damaged while parked at a golf course. A few days later he received a telephone call from a Bob Smith, stating that if the informer did not keep his mouth shut his face would look like the car. The informer testified this was what prompted him to ask the F.B.I. for another car.

The trial judge immediately instructed the jury as follows:

[T]here is no indication whatsoever from what has been said that would in any way connect these defendants with any comment that was supposedly made. The testimony is allowed for the sole and limited purpose of indicating what motivated him to seek another car. But, it should

not be considered by you in any fashion as being otherwise or in any way being connected with these two defendants.

On this record, any error, if error at all, would be harmless. The informer testified that neither Elledge nor Poole made any threats. The government stipulated there was no such evidence. The judge immediately instructed the jury that there was no evidence connecting the defendants with any supposed threat. The judge gave further limiting instructions that the evidence was allowed for the limited purpose of indicating what motivated the informer to seek another car. The government made no further use of the evidence. These circumstances show that the evidence had little, if any, effect. *See United States v. Preston,* 608 F.2d 626 (5th Cir.1979); *United States v. Wilkinson,* 601 F.2d 791 (5th Cir.1979).

AFFIRMED.