**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 08a0456n.06**
**Filed: August 1, 2008**

**No. 04-4476**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| ROBERT WILLIAM KEELER, | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |

**Before: DAUGHTREY, GILMAN, and ROGERS, Circuit Judges.**

**Rogers, Circuit Judge.** This case is part of a consolidated appeal involving thirteen defendants who were members of the Outlaw Motorcycle Club ("OMC"), an international motorcycle club with chapters across the country and around the world. In 1997, the Federal Bureau of Investigation and state law enforcement agencies began an investigation into the Green region of the OMC, which consists of chapters in Dayton, Ohio; Fort Wayne, Indiana; Louisville, Kentucky; Indianapolis, Indiana; and Oklahoma City, Oklahoma. As a result of the investigation, a grand jury in the Northern District of Ohio returned a 40-count indictment in 2003 charging the defendants with various offenses, including Racketeer Influenced and Corrupt Organizations Act ("RICO"), drug trafficking, and firearms offenses. The defendants were tried before an anonymous jury.

Defendant Robert W. Keeler was convicted on one count of substantive RICO in violation of 18 U.S.C. § 1962(c), one count of RICO conspiracy in violation of 18 U.S.C. § 1962(d), one count of conspiracy to possess with intent to distribute narcotics in violation of 21 U.S.C. § 846, and six counts of unlawful use of a communication facility in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2. He was acquitted on one count of firearms conspiracy. Following the trial, Keeler was sentenced to a total of 96 months in prison.

Keeler helped to establish the OMC chapter in Fort Wayne, Indiana, in 2001 and then became its first president. As a member of the OMC leadership, he attended "bosses meetings" where official OMC policy was set. Among other things, these meetings were held to discuss and make policies pertaining to OMC drug distribution. The drug trade was a central feature of OMC chapters in the Green region, and the Fort Wayne chapter was no exception. Keeler personally engaged in drug transactions with member Danny Hedges and member Gary Watkins, the latter having become a confidential informant for the Government. Keeler acquired cocaine from Hedges and sold 46.7 grams of methamphetamine to Watkins. Keeler also traveled to Florida with other OMC members to meet with their methamphetamine supplier. In addition, he exercised some regulatory control over the Fort Wayne members' drug sales. For example, in chapter meetings he discussed using the drug trade to finance the purchase of a new chapter clubhouse, and he also discussed with other members the possibility of placing a "tax" on the profits of their drug sales in order to support the operations of the Fort Wayne chapter. Furthermore, he set local OMC drug policy by refusing to ban the sale or use of methamphetamine by members in the Fort Wayne chapter. In response to the fact that the

Louisville chapter had considered such a ban, Keeler proclaimed, "As long as Fort Wayne's going, and I'm the boss here [,] [the OMC Ft. Wayne members are] allowed to do what the F they want."

On April 8, 2003, Keeler was named in a 40-count indictment issued in the Northern District of Ohio. As the culmination of a wide-ranging, six-year investigation of the OMC Green region, the indictment charged Keeler and 37 other OMC members with various federal crimes. In particular, Keeler was charged with five offenses: (1) RICO in violation of 18 U.S.C. § 1962(c); (2) RICO conspiracy in violation of 18 U.S.C. § 1962(d); (3) conspiracy to possess with intent to distribute narcotics in violation of 21 U.S.C. § 846; (4) unlawful use of a communication facility in violation of 21 U.S.C. § 843(b) and 18 U.S.C. § 2; and (5) firearms conspiracy in violation of 18 U.S.C. § 924(o). He was convicted of all but the firearms conspiracy.

At the sentencing hearing, the Government sought a base offense level of 36 on the basis that Keeler was responsible for possessing and/or distributing at least 5 kilograms, but less than 15 kilograms, of methamphetamine. The Government also sought a four-level enhancement because of Keeler's leadership role in the OMC. Keeler naturally sought a lower offense level. He argued that his base offense level should have been 26 because he was responsible for at least 50 grams, but less than 200 grams, of methamphetamine. He also objected to the leadership enhancement. Furthermore, he requested that his offense level be reduced by two levels to reflect his acceptance of responsibility, and he asked for departures based on imperfect entrapment and his poor health.

After hearing each side's arguments, the district court determined Keeler's base offense level to be 30, which corresponds to a quantity of methamphetamine of at least 350 grams, but less than 500 grams. *See* U.S.S.G. § 2D1.1(c)(5). The district court then applied a four-level enhancement pursuant to U.S.S.G. § 3B1.1(a) for Keeler's leadership role in the criminal enterprise, finding that "the evidence which I heard at trial demonstrated beyond a reasonable doubt that Mr. Keeler was an organizer and leader . . . ." Next, the district court denied Keeler's request for a two-level reduction for acceptance of responsibility as well as his request for a downward departure for imperfect entrapment. The district court did, however, grant him a downward departure because of his poor health. That departure reduced Keeler's offense level from 34 to 29, thereby giving him a Guidelines range of 87-108 months. The district court sentenced Keeler within that range by imposing a 96-month sentence for his RICO, RICO conspiracy, and drug conspiracy offenses. As to the offenses of unlawful use of a communication facility, the district court imposed the statutory maximum sentence of four years. All of the sentences were ordered to run concurrently.

On appeal, Keeler argues that his narcotics conspiracy conviction should be reversed because it is not supported by sufficient evidence. He also contends that his sentence should be vacated for three reasons: (1) that his base offense level should have been set at 19 instead of 30; (2) that he was improperly assessed a four-level enhancement based on an erroneous finding that he had occupied a managerial role within the OMC; and (3) that he was erroneously denied an imperfect-entrapment departure. These arguments are without merit.

**I.**

Keeler's narcotics conspiracy conviction is supported by sufficient evidence. Conviction of narcotics conspiracy under 21 U.S.C. § 846 requires the Government to prove that an agreement to violate the drug laws existed, and that the defendant "'knew of, intended to join, and participated in the conspiracy.'" *United States v. Conrad*, 507 F.3d 424, 432 (6th Cir. 2007) (quoting *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002)). Proof of an explicit, formal agreement among the co-conspirators is not necessary. *See United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (quoting *United States v. Avery*, 128 F.3d 966, 970-71 (6th Cir. 1997)). Instead, "[t]he existence of a conspiracy 'may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan.'" *Id.* (quoting *Avery*, 128 F.3d at 971). Additionally, "a defendant's knowledge of and participation in a conspiracy may be inferred from his conduct and established by circumstantial evidence." *Id.* (quoting *United States v. Salgado*, 250 F.3d 438, 447 (6th Cir. 2001)).

The existence of a drug-distribution agreement among OMC members is evidenced by the fact that they bought and sold drugs from each other, as well as by the fact that the OMC leadership regulated its members' drug-dealing activities and considered "taxing" their profits to support the organization. Keeler's actions as president of the Fort Wayne OMC chapter demonstrate that he knowingly and intentionally joined this conspiracy and participated in it. He personally engaged in drug transactions with at least two OMC members — Hedges and Watkins — and played a role in setting drug-dealing policies for his chapter and the entire OMC organization. Moreover, the evidence indicates that Keeler and other members discussed using proceeds from drug dealing to

finance the activities of the Fort Wayne chapter. He also traveled to Florida with other OMC members to meet with their supplier of methamphetamine. In light of all of this evidence, Keeler's sufficiency-of-the-evidence argument must fail because there is enough proof for a rational jury to be convinced of Keeler's guilt beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Keeler disputes this conclusion. He correctly points out that a conspiracy charge cannot be proven solely on the basis of an agreement between a defendant and a Government agent since Government agents cannot count as co-conspirators. *See United States v. Williams*, 274 F.3d 1079, 1084 (6th Cir. 2001) (citing *United States v. Pennell*, 737 F.2d 521, 536 (6th Cir. 1984)). On the basis of this rule, he argues that his conviction must be overturned because the Government did not prove that he made drug sales to anyone other than Gary Watkins, who was acting as a Government agent at the time. There are two problems with this argument. First, it defines the conspiracy too narrowly. The evidence shows that the agreement to distribute drugs existed among Keeler and many other OMC members, not merely between Keeler and Watkins. The fact that Keeler was part of a larger OMC drug conspiracy that went beyond him and Watkins is evidenced by his participation in the making of OMC drug policies, his trip to Florida to meet with OMC drug suppliers, his acquisition of drugs from Danny Hedges, his conversations with Watkins pertaining to placing a "tax" on the drug profits of OMC members, and even by his sale of drugs to Watkins.[1]

---

[1]Although Watkins's status as a Government agent prevents his drug-related conversations with Keeler and his drug transaction with Keeler from being used to prove that there was a conspiracy solely between Keeler and Watkins, both the transaction and the conversations can be

In short, this evidence shows that an agreement to distribute drugs existed among Keeler and many other OMC members. Because there is no evidence that these other members were also Government agents, it is immaterial that Keeler's only sale of drugs was made to Watkins.

The second fault in Keeler's argument is that it assumes that proof of a drug sale is necessary to prove an agreement to distribute drugs. Proof of an agreement to commit an offense does not require proof that the offense was actually committed. In order to prove the existence of an agreement to distribute drugs, the Government need not prove that Keeler distributed any drugs, much less that he distributed drugs to individuals other than Watkins. Proof of the agreement to distribute drugs does not require evidence of more than a tacit understanding among the parties. *See Martinez*, 430 F.3d at 330 (quoting *Avery*, 128 F.3d at 970-71). This threshold was reached — and surpassed — here.

## II.

Keeler's base offense level was correctly determined to be 30. When an individual is convicted of a RICO offense, his base offense level is the greater of 19 or the highest offense level applicable to the underlying racketeering activities. *See* U.S.S.G. § 2E1.1(a). In this case, there were three separate racketeering activities underlying Keeler's substantive RICO offense — conspiracy to distribute drugs, use of a communication facility in the distribution of drugs, and tampering with

considered as evidence of a conspiracy among Keeler and other individuals. *See United States v. Hayden*, 68 F. App'x 530, 532 (6th Cir. 2003) (citing *United States v. Esparsen*, 930 F.2d 1461, 1472 n.11 (10th Cir. 1991); *United States v. Elledge*, 723 F.2d 864, 866 (11th Cir. 1984)).

a witness, victim, or an informant. In such situations, the district court must use the highest offense level among the multiple racketeering acts. *See* U.S.S.G. § 1B1.1, Commentary, Application Note 5. Therefore, because the highest offense level among the three was the 30 that the Guidelines provided for the drug conspiracy, the district court correctly set Keeler's base offense level at 30 instead of 19.

Keeler claims that the district court erred in determining that the Guidelines provided a base offense level of 30 for the drug conspiracy,[2] but he is wrong. In cases like Keeler's, where the offense of conviction does not establish that death or serious bodily injury resulted from the use of the controlled substance at issue, the offense level applicable to a drug offense is determined according to the quantity of drugs involved. *See* U.S.S.G. § 2D1.1(a)(3). A base offense level of 30 corresponds to a quantity of methamphetamine of at least 350 grams but less than 500 grams. *See* U.S.S.G. § 2D1.1(c)(5). The district court applied this offense level based on its finding that Keeler was responsible for up to 500 grams of methamphetamine. This finding cannot be reversed unless it is shown to be clearly erroneous, *see United States v. Wittingen*, 519 F.3d 633, 637 (6th Cir. 2008) (quoting *United States v. Gale*, 468 F.3d 929, 934 (6th Cir. 2006)), and Keeler has not met this standard. He contends that the district court could not have found him responsible for more than the 46.7 grams of methamphetamine that he sold to Gary Watkins because that was the only amount that

---

[2]Keeler also claims that the district court should not have considered any offense level attributable to the drug conspiracy because there was not sufficient evidence to prove that he was guilty of the drug conspiracy charge. This issue need not be addressed because, as discussed in the previous section, there is plenty of evidence to support a finding of guilt on Keeler's drug conspiracy charge.

he was proven to have sold. This argument, however, ignores the rule that "a defendant may be sentenced based upon quantities of drugs attributable to other members of a conspiracy, provided the district court finds that those quantities were known to the defendant or were reasonably foreseeable to him." *United States v. Jennings*, 83 F.3d 145, 150 (6th Cir. 1996) (quoting *United States v. Moss*, 9 F.3d 543, 552 (6th Cir. 1993)). Given his level of involvement in the OMC narcotics conspiracy, it is easy to conclude that the quantity of drugs involved in other OMC members' transactions was known to Keeler or at least reasonably foreseeable to him. Therefore, the district court appropriately sentenced Keeler based on the quantities of drugs distributed by other members of the conspiracy.

After setting Keeler's base offense level at 30, the district court properly enhanced it to 34 because there was sufficient evidence to find by a preponderance of the evidence that he had been "an organizer or leader of a criminal activity that involved five or more participants . . . ." U.S.S.G. § 3B1.1(a). Keeler admits that he was president of the Ft. Wayne OMC chapter, but he contends that he was merely a figurehead who had no real authority or leadership role. The evidence indicates otherwise. In determining whether the § 3B1.1(a) enhancement applies, this court considers the following factors:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

*United States v. Hernandez*, 227 F.3d 686, 699-700 (6th Cir. 2000) (quoting U.S.S.G. § 3B1.1(a), Commentary, Application Note 4). Taking these factors into account, the enhancement was warranted in this case because the evidence shows that Keeler exercised decision-making authority, participated in planning the OMC's criminal activities, and exercised significant control over others. For instance, his leadership role is demonstrated by his statement that "As long as Fort Wayne's going, and I'm the boss here[,] [the OMC Ft. Wayne members are] allowed to do what the F they want." The fact that he attended OMC bosses meetings and helped set OMC drug-distribution policies also indicates that he was a leader in the organization. Finally, his leadership position is evidenced by the fact that he ordered Gary Watkins and Dan Hedges to take voice stress tests to prove that they were not cooperating with the Government. Keeler would not have had such control over others had he not been a leader or organizer of the OMC criminal enterprise.

Aside from the question of whether there was sufficient evidence to apply the managerial enhancement, Keeler also argues that the enhancement was improperly applied because the district court's ruling on his objection to the enhancement did not comply with the requirements of Rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure. Rule 32(i)(3)(B) says that a district court, at sentencing, "must — for any disputed portion of the presentence report or other controverted matter — rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). Keeler claims that the district court fell short of its duty to comply with this rule because it failed to make factual findings on the question of leadership. This contention, however,

ignores the fact that the district court did make factual findings on that issue when it stated that "the evidence which I heard at trial demonstrated beyond a reasonable doubt that Mr. Keeler was an organizer and leader . . . ." Although brief, this statement is a sufficient ruling on Keeler's objection. It satisfies this court's requirement of "literal compliance" with Rule 32(i)(3)(B) because it shows that the district court actually found facts by at least a preponderance of the evidence rather than blindly embracing the presentence report. *See United States v. White*, 492 F.3d 380, 415-16 (6th Cir. 2007).

Finally, this court cannot address Keeler's argument that he was entitled to a departure based on imperfect entrapment. This court lacks the authority to review a district court's refusal to grant a departure unless the district court mistakenly believed that it lacked the authority to do so. *See United States v. Puckett*, 422 F.3d 340, 345 (6th Cir. 2005) (citing *United States v. Stewart*, 306 F.3d 295, 329 (6th Cir. 2002)). In this case, the district court denied the departure because it found that the evidence "belies entrapment," not because it was under the impression that it lacked authority to grant the departure.

**III.**

For the foregoing reasons, Keeler's convictions and sentence are AFFIRMED.