UNITED STATES of America,
Plaintiff-Appellee,

v.

Rubiett JENKINS, Louis Quarterman,
and Virginia Ellis Prather,
Defendants-Appellants.

UNITED STATES of America,
Plaintiff-Appellee,

v.

Wendell McTEER, Sr.,
Defendant-Appellant.

Nos. 84–8671, 84–8809.

United States Court of Appeals,
Eleventh Circuit.

Jan. 10, 1986.

Bruce S. Harvey, Atlanta, Ga. (Court-appointed), for Quarterman.

Glenn Zell, Atlanta, Ga., for Prather.

Frank L. Derrickson, Atlanta, Ga., for Jenkins.

Janet F. King, Robyn C. Mitchell, Asst. U.S. Attys., Atlanta, Ga., for plaintiff-appellee U.S.

Joe M. Harris, Atlanta, Ga. (Court-appointed), for McTeer.

Before RONEY and ANDERSON, Circuit Judges, and MORGAN, Senior Circuit Judge.

MORGAN, Senior Circuit Judge:

The four appellants in this case appeal their respective convictions on one count each of conspiracy to possess with intent to distribute cocaine in violation of 21 U.S.C. § 846. They challenge numerous aspects of the proceedings below, asserting, *inter alia*, insufficiency of the evidence to support their convictions, and a fatal variance between the conspiracy charged in the indictment and the conspiracy proved at trial. We have jurisdiction of these direct appeals from criminal convictions. 28 U.S.C. § 1291.

## GENERAL FACTUAL OVERVIEW

This case arises from a two-count indictment returned by a grand jury in the Northern District of Georgia naming the four appellants and fourteen others as participants in a drug scheme involving cocaine. Count one alleged that beginning as of January, 1976, and continuing up to December, 1982, the defendants conspired in the Northern District and "elsewhere" to willfully possess with intent to distribute cocaine in violation of 21 U.S.C. § 846. Count two charged that on an unknown date in June of 1980, the defendants possessed with intent to distribute a quantity of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Although the indictment contained little more than these generalized allegations, a subsequent bill of particulars provided by the government flushed out these contentions in some detail. [Rec. 648–665].[1] Only eight of the defendants actually went to trial, and of those defendants, appellants Quarterman, Prather, McTeer and Jenkins appeal their convictions on count one here. Two of the remaining four co-defendants were acquitted on the conspiracy charges, and the lower court granted Rule 29 motions as to all defendants on the substantive count.

The facts adduced at trial, when viewed in a light most favorable to the prosecution, *see, e.g., United States v. Dekle,* 768 F.2d 1257, 1259 (11th Cir.1985), established a far reaching drug scheme involving many of the named defendants over a time span of nearly six years and stretching across much of the eastern seaboard. It would be fair to characterize the proof as focusing upon defendants James C. Murphy, who was a fugitive at the time of trial, and Robert Ingram, who testified for the prosecution at trial, and their dealings and relationships with the remaining defendants in the case. The government presented what

---

**1.** Appellant Quarterman contends that the indictment here is fatally vague because (1) it failed to allege that he did anything, (2) it failed to adequately specify the time of the offense, and (3) it failed to define the elements of the offense charged. We note, however, that "[a]n indictment is sufficient if it charges the offense in the words of the statute ...; therefore a Section 846 indictment is sufficient if it alleges a conspiracy to distribute drugs, the time during which the conspiracy was operative and the statute allegedly violated...." *United States v. Marable,* 578 F.2d 151, 154 (5th Cir.1978) (citations omitted). Quarterman's argument essentially is that the indictment is necessarily vague due to the long duration of the conspiracy charged. We reject that contention outright. The six year duration of the conspiracy charged, rather than being an indication of vagueness in the indictment, instead reflects the expansiveness of the joint enterprise undertaken by the defendants here, as described throughout this opinion. *See United States v. Harrell,* 737 F.2d 971, 975 n. 4 (11th Cir.1984) (sheer length of 48 month conspiracy alleged in indictment does not indicate vagueness where the defendant was implicated throughout that 4 year period; detail necessary in indictment is only to set forth elements of offense, not to provide evidentiary details), *cert. denied,* — U.S. —, —, 105 S.Ct. 923, 1392, 84 L.Ed.2d 781 (1985). The government's proof implicated Quarterman generally throughout the entire duration of the six year conspiracy charged. We find the instant indictment sufficiently definite to withstand scrutiny.

might be described as a "dry" drug conspiracy case—so described because of the lack of physical evidence of drugs or drug activities, except for the testimony of various members of the trafficking network implicating their former associates. Much of that testimony was presented in generalities concerning the defendants' past drug dealings, with the witnesses often being unable to pinpoint times, dates or the exact activities undertaken by particular individuals.

Nevertheless, viewed with a favorable eye, the evidence at trial established a cocaine distribution operation centered around Murphy and Ingram. In the middle 1970's, they began to come to Atlanta, Georgia from their home location in Jacksonville, Florida to distribute cocaine. Appellant Quarterman eventually moved to Atlanta joining their distribution efforts, and the three became known as a loose association called "The Florida Boys," emanating from a barbeque business partially owned by Murphy and Quarterman called the "Florida Boys Barbeque." Quarterman's residence in Atlanta, "the ranch," was a central meeting place that many of the defendants frequented and where cocaine was stored. Jacquelyn Wells, originally a co-defendant who plead and testified at trial, became a major link in the operation during the late 1970's. As one of Murphy's paramours, she stored much of Murphy's cocaine at her residence, which became a distribution point for those drugs in the Atlanta area.

The cocaine apparently came from at least two sources during this time period. Initially, Murphy and Ingram obtained quantities from Miami, through appellant Virginia "Moms" Prather. Murphy was accompanied on occasion by Ivory Pool on his drug purchasing trips to Miami, with Pool functioning as his driver. During this time period, appellant McTeer also became involved with the Florida boys, to the extent that he transported sausages to the barbeque establishments and participated in the distribution of cocaine. A second source of cocaine came through Philadelphia and an individual by the name of "Ali."

Based upon this background, each of the appellants in this case raises two primary contentions on appeal. First, each of the appellants contends that the evidence against them was insufficient to support the jury's finding of guilt on the conspiracy charge. Except for the sufficiency of the evidence argument as to appellant Jenkins, we find no merit to any of these contentions. As an alternative argument, each of the appellants asserts some form of a variance issue—that the conspiracy established at trial, if proven at all, was in fact a different conspiracy than that alleged in the indictment. Based upon that contention, the appellants urge varying rationale in support of the same result, reversals of their convictions.

### THE SUFFICIENCY OF THE EVIDENCE

All of the appellants challenge the sufficiency of the evidence to support their convictions for conspiracy. Numerous guidelines aid our task of appraising the evidence adduced at trial, as set forth in detail in *United States v. Cotton*, 770 F.2d 940 (11th Cir.1985). As that court noted:

> To sustain a conviction in a federal drug conspiracy case the government bears the burden of proving beyond a reasonable doubt that a conspiracy existed, that the defendant knew of it, and voluntarily joined in it. *United States v. Lippner*, 676 F.2d 456, 466 (11th Cir.1982). With regard to intent, the government must prove beyond a reasonable doubt that the defendant had a deliberate, knowing, and specific intent to join the conspiracy. *United States v. DeSimone*, 660 F.2d 532, 537 (5th Cir. Unit B 1981), *cert. denied*, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982). While circumstantial evidence may be used in proving a conspiracy, more than mere presence at the scene of the crime must be shown. *United States v. Pintado*, 715 F.2d 1501, 1504 (11th Cir.1983).

*Id.* at 944. Applying these principles to the record before us, allowing all reasonable inferences for the government, *see, e.g., United States v. Carter,* 760 F.2d 1568, 1582 (11th Cir.1985); *United States v. Payne,* 750 F.2d 844, 855–56 (11th Cir. 1985), we find that except as to appellant Jenkins, a reasonable trier of fact could find that the evidence presented established the appellants' guilt of conspiracy beyond a reasonable doubt. We need not recount all of the evidence against the appellants, as the evidence adduced at trial clearly would allow for the jury to find a conspiracy as generally set forth above. Rather, addressing the appellants *seriatim,* it is sufficient to point out some of the specific evidence presented at trial as to each appellant and the arguments made in relation thereto.

### Appellant Quarterman

Quarterman essentially argues that the evidence adduced as to him proved only his mere association with others involved in the conspiracy and his presence in the general area of the offense. This contention is simply not supported by the record. As set forth below, the testimony presented at trial, if believed, established Quarterman's knowledge and active participation in the conspiracy to distribute cocaine.

Robert Ingram testified at trial that shortly after he and Murphy began to distribute cocaine in Atlanta, Quarterman moved to the area and the three of them began to distribute cocaine. [Tr. 33]. Later, approximately sometime in 1979, Ingram started receiving additional quantities of cocaine from a supplier in Philadelphia, and he, Quarterman, and an individual named Joe Perry would distribute those drugs in the Atlanta area as well. [Tr. 45]. On one occasion, Ingram recounted that Quarterman gave him three to five thousand dollars to purchase cocaine in Philadelphia. [Tr. 35]. Throughout the late 1970's, Ingram's associates in his drug enterprises remained basically the same, although individuals were added along the way, and the cocaine that was brought into Atlanta was sometimes stored at Quarterman's residence, "the ranch." [Tr. 36, 67]. Ingram also clearly testified that after 1980, a definite point of reference for him due to his temporary incarceration during that year, the cocaine distribution group still included Quarterman. [Tr. 67].

Jacquelyn Wells testified at trial as to her involvement in the distribution ring, noting that she often stored cocaine at her home and acted as the distributor to those who sold cocaine for Murphy. [Tr. 210–11]. She identified Quarterman, or "Ali-Babba" as he was also known, as one of the Florida boys, the group to whom she distributed Murphy's cocaine. *Id.* Wells indicated that her main involvement was with Ingram and Ali Babba, [Tr. 211], and she related that after her position as one of Murphy's girlfriends changed and she no longer acted as the holder of Murphy's cocaine, Quarterman assumed the duty of dispensing the drugs. [Tr. 217]. The last major witness testifying as to Quarterman was Ivory Pool, Murphy's driver. Pool testified that he often drove Murphy to Atlanta to deliver drugs, which sometimes were delivered to Quarterman's residence, the ranch, when Quarterman was present. [Tr. 380, 635].

### Appellant Prather

Like the other appellants, Prather contends that the evidence adduced at trial was insufficient to support her conviction, but she does so based upon so-called *James* grounds. She contends that the primary evidence presented against her was testimony presented by Ingram and Pool as to statements allegedly made by Murphy implicating Prather in the conspiracy. The appellant's contention is that aside from that testimony, which was admitted pursuant to Fed.R.Evid. 801(d)(2)(E), there was no substantial independent evidence to support a finding that Prather was involved in the conspiracy. Therefore, she argues that the testimony of Ingram and Pool was admitted in violation of *United States v. James,* 590 F.2d 575 (5th Cir.) (en banc), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), and that the remaining

evidence presented against her would be insufficient to support her conviction. We note that the government's brief is totally devoid of argument to the contrary that might aid this court's determination in this regard.

In language quoted time and time again, in interpreting Rule 801, the *James* court determined that

on an appropriate motion at the conclusion of all the evidence the court must determine as a factual matter whether the prosecution has shown by a preponderance of the evidence *independent of the statement itself* (1) that a conspiracy existed, (2) that the co-conspirator and the defendant against whom the statement is offered were members of the conspiracy, and (3) that the statement was made in furtherance of the conspiracy.

590 F.2d at 582 (emphasis added). A trial court's findings under *James*, as determinations of fact, will not be overturned unless clearly erroneous. *United States v. Perry*, 624 F.2d 29, 30 (5th Cir.1980); *United States v. Bulman*, 667 F.2d 1374, 1379 (11th Cir.), *cert. denied*, 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982). As these decisions make clear, the trial court's evaluation of the evidence is both a quantitative and qualitative appraisal.

In this case, the trial court made an initial *James* finding pertaining to all defendants. [Tr. 621]. Appellant Prather renewed her motion at the close of the government's case, [Tr. 796], and the court implicitly denied the motion. [Tr. 823]. Throughout the course of the trial, the lower court continually examined the evidence adduced as to each defendant, and the court clearly correctly understood its role and the quantum of evidence required to meet the *James* standard, especially as to Prather. [*See, e.g.,* Tr. 423–429]. After an examination of the record, we cannot say that the trial court's *James* finding was clearly erroneous, and focus here on only that portion of the applicable standard requiring proof that Prather was a member of the conspiracy.

We discern at least three specific matters supporting the trial court's *James* finding. First, we note that Jacquelyn Wells related that in the course of her duties of distributing cocaine, one of her responsibilities was to take messages from persons regarding drugs. She indicated that "Moms," appellant Prather, was one of the three persons from whom she took such messages. [Tr. 229]. Wells did not specify details as to the messages given or received, or how in fact she knew the identity of her callers. Nevertheless, she did identify Prather at trial and she indicated that she met Prather at a party at the ranch for three or four hours. [Tr. 220–23]. Whether Wells recognized Prather's voice or Prather identified herself in those telephone calls, we find sufficient circumstantial evidence to conclude that Wells knew and could properly recount the identity of her callers, at least in regard to appellant Prather. *Cf. United States v. Lopez*, 758 F.2d 1517, 1520 (11th Cir.1985) (on tape recorded telephone conversations presented at trial, although the defendant's voice was not identified, there was sufficient circumstantial evidence to attribute that voice to him where he was identified in court as one of the individuals attending the meeting that was the product of the conversation and where his self-identification during the course of the call constituted an admission by a party admissible under Fed.R.Evid. 801(d)(2)(A)).

Second, Ivory Pool testified in detail as to matters that pointed circumstantially to a transfer of cocaine at Prather's residence to Murphy. He recounted a trip when he and Murphy visited Prather at her residence. Pool indicated that they drove to the house in his automobile, and that prior to their meeting, Murphy did not possess cocaine, but did possess money. Pool testified that Prather and her daughter Ruby were present at the house, and that those present snorted some of the cocaine. Although he did not witness the actual transaction, Pool indicated that immediately after leaving Prather's residence, Murphy had approximately a half to a pound of

cocaine. Pool testified that he had possession of his car keys at all times, that his automobile was locked, and that the only possible place of transfer was at Prather's residence. [Tr. 385, 629, 683]. Mere presence alone of course is not indicative of a conspiracy. Nevertheless, Prather's presence is material and probative in the totality of these circumstances. *See, e.g., United States v. Alvarez*, 755 F.2d 830, 854 (11th Cir.1985).

■ Third, we point to testimony by Pool as to a meeting between himself, Prather and Murphy in Jacksonville. While located in a bedroom in Prather's presence, Murphy made the statement to Pool that he had to "get some money up" for Moms to finish paying for the cocaine received in Miami. Prather did not respond in any manner to this statement by Murphy. [Tr. 388, 391, 631–32]. We conclude that this statement was an adoptive admission under Fed.R. Evid. 801(d)(2)(B) that could have been considered as part of the independent evidence to be appraised in making the necessary *James* determination.[2] In *United States v. Carter*, 760 F.2d 1568, 1581 (11th Cir.1985), this court held that such adoptive admissions are proper independent evidence to be considered for that purpose. The *Carter* court addressed the standard that must be met in determining whether an adoptive admission has occurred under Rule 801(d)(2)(B):

> the primary inquiry is whether the statement was such that, under the circumstances, an innocent defendant would normally be induced to respond, and whether there are sufficient foundational facts from which the jury could infer that the defendant heard, understood, and acquiesced in the statement.... Before admitting such a statement, the trial court must determine, as a preliminary question, whether these two criteria have been met.

760 F.2d at 1579–80 (citations omitted).

■ Here, as in *Carter*, the trial court did not explicitly make these preliminary findings, although it is equally clear that the trial court considered the question to be a matter of potential adoptive admissions without designating it as such. Having expressed his concern over Prather's ability to hear and understand Murphy's incriminating statements, the trial court conducted his own inquiry of Pool as to this matter.[3] Pool's recollection of Murphy's state-

---

**2.** There is no way of knowing the exact basis for the lower court's *James* determination from the record below. The court heard intermittent testimony interspersed with argument at numerous times throughout the trial, both before and outside the presence of the jury. Once the *James* determination was finally made, the court did not set forth its specific basis for finding independent evidence of participation in the conspiracy as to each defendant. Nor did the trial court make a separate, preliminary finding as to Prather's ability to hear Murphy's statement or as to her acquiescence in that statement. Nevertheless, shortly after making its *James* determination, [Tr. 621] the court allowed Pool to testify before the jury as to the adoptive statements in question. [Tr. 631–32]. Therefore, in light of the lower court's earlier concerns, *see infra*, note 3, we feel justified in concluding that this testimony was one basis for its *James* finding.

**3.** These circumstances at trial evolved as follows:

Q. [By Mrs. King, the prosecutor] And what occurred in your presence?

A. [By Pool] Mr. Murphy made a statement that he had to get some money off of Moms.

Q. Was she—

A. She was at the house, yes.

Q. Everyone in the same room?

A. Yes.

Q. All right. And what did that individual respond, Moms?

A. She—She didn't respond anything. Mr Murphy made the statement that he had to get some money up.

The Court: Get some money up.

The Witness: Yes, get some money.

By Mrs. King:

Q. All right. What prompted that statement?

A. Because of cocaine.

Q. No—

A. What prompted the statement. She was there to pick up her money, that's what she was there for, to pick up her money.

Mr. Robbins: Your Honor, I am going to object—that would be hearsay—and ask that that not be allowed.—

The Court: Well, first of all, this is again another one of the things I have difficulty with. There are as many exceptions to the hearsay rule as there is substance to the rule. Generally a statement "This is hearsay" conveys very little to the court.

ments implicated Prather in illegal drug activities in such a manner that an innocent party would be expected to assert her non-complicity. Furthermore, Pool's testimony as to the size of the room and Murphy's tone of voice was such that Prather could be presumed to hear his statements. *See*

> Now, here you have a situation where two people are in the room. You don't have the same rules of hearsay necessarily where you got them both in the room. All right. Now, articulate precisely your objection.
> Mr. Robbins: My objection is, Your Honor, that there's been no predicate laid to show whether or not whoever he says Moms is, to show whether or not she was there, if she was within earshot of the statement.
> The Court: She asked were they in the same room.
> Mr. Robbins: I understand that but they could have been whispering back and forth and we don't know if this person who he says is Moms—if she heard the statement.
> The Court: Now, that's your objection?
> Mr. Robbins: My objection is also, Your Honor—Yes, that's my objection and it's pure hearsay what somebody told him.
> Mrs. King: Your Honor, I would—
> Mr. Robbins: Mrs. Prather does not have the right to cross-examine what Mr. Murphy—
> The Court: You just said it's not what somebody told this witness?
> Mr. Robbins: What Mr. Murphy told this gentleman.
> The Court: Well, the way I heard it from the testimony was not that.
> Mr. Robbins: How did Your Honor hear it?
> The Court: I heard it as something—as a statement which was overheard by this witness. At least that's the impression I got.
> Mr. Robbins: And the impression I got—and maybe we can clear this up—
> The Court: All right. Ask the witness but please when you make a hearsay objection don't just say "that's hearsay." Tell me why it isn't in one of the 50 or hundred exceptions thereto. Okay. Proceed.
> By Mrs. King:
> Q. Mr. Pool, who was the statement made to?
> A. Mr. Murphy made the statement to me.
> Q. All right. And where were you all at?
> A. We was in the house, in one room together. In one room together.
> The Court: let me ask you.
> By the Court:
> Q. Where were you?
> A. It was in the house.
> Q. Whose house?
> A. Mr. Murphy's house.
> Q. Where in the house were you?
> A. It was in the upstairs bedroom.
> Q. Upstairs bedroom?
> A. Yes.

*supra* note 3. Based upon this record, like the *Carter* court, *see* 760 F.2d at 1580, we find that the trial court implicitly admitted the statements as adopted admissions and that such admissions were proper considerations as independent evidence in making the necessary *James* finding.[4]

> Q. What persons were in the room?
> A. Moms, Murphy, and I.
> Q. How big a room was it?
> A. It's a pretty good sized room.
> Q. Well, what do you mean by pretty good sized?
> A. Like the size of a regular bedroom, Your Honor?
> Q. How big do you thik a regular bedroom is?
> A. 18 by 24. I don't know really.
> Q. All right. Now, when Mr.—what was it Mr. Murphy said?
> A. That he had to get some money up from Moms.
> Q. All right. Now, was he whispering to you?
> A. No, he didn't—he didn't say it in a whispering voice.
> Q. Did he say it loud enough for whoever the other person in the room was to hear it?
> A. I'm assuming they heard it. I don't know. I can't say that they heard it or not, Your Honor, but I know what he said to me.
> Q. Was it said in a tone of voice that was calculated for the other person to hear?
> A. I can't really say, Your Honor. I don't know what tone of voice you would be speaking of. It was not a whispering voice.
> The Court: Okay. Go ahead.
> [Tr. 388–92]. Although this testimony occurred outside the presence of the jury, the substance was revisited at a later time before the jury. [Tr. 631–32].

4. We recognize, as did the *Carter* court, that the admissibility of a Rule 801(d)(2)(B) adoptive statement is a two step process. The trial court is to make the preliminary determination, but the jury must make the ultimate determination of whether the defendant actually heard the contested statements and adopted them by failure to deny their truth. The lower court in *Carter* charged the jury specifically as to this burden, stating that if the jury found that the statements were actually heard by the defendants and those statements were made under circumstances such that the defendants would be expected to deny them if untrue, the jury was entitled to consider the defendants' silence as admissions of the truth of the statements. *See* 760 F.2d at 1580 n. 5. No such charge was given in the instant case.

We emphasize that the issue of whether such a jury charge is required is not before us, and

We find that this evidence represents sufficient independent evidence that appellant Prather was a member of the cocaine conspiracy such that the lower court's *James* determination was not clearly erroneous.

■ Having now concluded that the lower court did not err in making the *James* determination, we may also consider statements made by Murphy to Pool and Ingram in determining the overall sufficiency of the evidence as to Prather. In addition to the evidence set forth above, Pool testified that prior to the meeting with Prather at her residence in Miami, Murphy told him that the purpose of the trip was to purchase cocaine from Moms. [Tr. 628]. Ingram also related in detail another incident in which he and Murphy discussed their options as to buying one or two bags of cocaine from Prather, and how they decided to purchase both bags. Ingram provided Murphy with $10,000 for half of that cocaine eventually obtained from Prather. [Tr. 723–24]. Finally, as to Prather, there was testimony associating her with the other conspirators in both Jacksonville and Atlanta on occasion, [Tr. 630–32], and indicating that the cocaine she sold to Murphy was intended for distribution in the Atlanta area. [Tr. 223, 229, 631–32]. Although association alone will not support an inference of membership in a conspiracy, such association with co-conspirators may be considered as a factor. *United States v. Cole*, 704 F.2d 554, 557 (11th Cir.1983). Taken as a whole, we find sufficient evidence to support Prather's conviction on the conspiracy charge.

*Appellant McTeer*

McTeer presents a straight-forward argument that the evidence adduced at trial could not have allowed the jury to convict him of conspiracy beyond a reasonable doubt. Although the question is admittedly close, from our reading of the record as a whole, we find the following testimony sufficient to support the jury's finding of guilt as to him.

At trial, Ingram testified that McTeer had sold drugs for him both in Atlanta and Jacksonville prior to 1980. [Tr. 90–91]. He also indicated upon his release from custody in October of 1980, McTeer was at the ranch with a pound of cocaine, and others such as Ingram, Murphy and Quarterman were present. [Tr. 46]. Ingram related that he absconded with a portion of that pound, [Tr. 140], and that in fact he had received cocaine from McTeer in Atlanta. [Tr. 718]. Ingram generally described a working relationship between himself and McTeer whereby they would buy and sell each other's drugs in both Jacksonville and Atlanta extending over a period from 1976 to approximately 1982. [Tr. 88–93]. He clearly described McTeer as a member of the distribution group in Atlanta from 1980 to 1982. [Tr. 76]. Ivory Pool placed McTeer as being present at the ranch on numerous occasions, [Tr. 642], and present on at least one occasion when Pool and Murphy arrived with cocaine, although McTeer was not present to receive cocaine. [Tr. 669–70]. As McTeer also notes in his brief, the government introduced toll records indicating calls from various of the defendants to and from McTeer's wife's telephone number.

We find this evidence sufficient. Ingram, one of the centerposts of the conspir-

we in no way intimate how we might resolve the issue if squarely presented. At trial, the government offered Pool's testimony regarding Murphy's statement in Prather's presence. The defendant objected on general grounds of hearsay. The lower court expressed his perception that the testimony was in fact an adoptive admission, conducted an inquiry into that possibility, and eventually admitted the testimony without further explanation. There is no indication in the record that a specific jury charge on the issue was ever requested. Based upon these circumstances, we conclude that the lower court implicitly made the requisite findings for admitting Pool's testimony of Prather's adoptive admissions and that such testimony could be considered as independent evidence of Prather's involvement in the conspiracy for *James* purposes. The question of whether under such circumstances the trial court must also instruct the jury as to adoptive admissions has not been presented in this appeal, and we specifically decline to reach it.

acy, testified not only as to his direct dealings with McTeer, but also to McTeer's status as a member of the cocaine distribution conspiracy. That testimony was bolstered by the factor of McTeer's association with the other members of the conspiracy on various occasions. We note that McTeer, as did all of the defendants below, took the stand in his defense and denied any involvement in a cocaine conspiracy. He contended that his involvement with the Florida boys was to transport sausages from Jacksonville occasionally for sale through the barbeque business. He claimed to be a social friend of Murphy's, and that any calls placed to or from his telephone by Jacquelyn Wells, appellant Prather's husband, or others involved in this case, were not placed by him. [*See generally* Tr. 867–79]. In short, we note that the jury had the opportunity to weigh the strength of Ingram's testimony versus that of McTeer, and it chose to believe the former as corroborated by circumstances as set forth above. As the *Cotton* court observed, "When a defendant takes the stand in a criminal case, he subjects himself to a determination by the jury of his credibility. The jury is free to disbelieve him and reject his explanation as complete fabrication." 770 F.2d at 945. Therefore, there was sufficient evidence to conclude that McTeer had knowledge of and voluntarily joined the cocaine distribution conspiracy.

### Appellant Jenkins

Rubiett Jenkins, a co-defendant below and the daughter of appellant Prather, contends that she was convicted based upon mere presence or association with other co-defendants, and based upon her status as Prather's daughter. We agree that a reasonable jury could not have found Jenkins guilty of conspiracy based upon this record.

Jenkins was mentioned during the course of the trial below in only four significant regards. Jacquelyn Wells testified that she had met Jenkins and Prather at a party at the ranch, and that "they" had brought cocaine with them in a baby's diaper. [Tr. 220–23]. On cross-examination, however, it was brought out that Wells could not in fact attribute the cocaine to Prather, Jenkins or anyone, as any knowledge she had on the subject was purely hearsay. This diaper incident formed the basis for the substantive count named in count two of the indictment. The lower court granted all defendants' motions for judgment of acquittal on that count, [Tr. 823], and we similarly discount Wells' hearsay testimony in this regard. Second, Pool testified, as noted earlier, that during the incident in Miami when Murphy apparently obtained cocaine while at Prather's house, Jenkins was also present in the house. [Tr. 385, 627]. Upon close examination, that testimony does nothing more than indicate Jenkins' mere presence at her mother's home.[5] Third, Pool testified that he also met Jenkins at Murphy's residence in Jacksonville, where he "assumed" that she came to pick up money for a package of drugs. [Tr. 632]. On cross-examination, it was clearly brought out that Pool's assumption was

---

5. We recognize the apparent inconsistency on one hand in finding Jenkins' presence during this incident to be "mere presence," while previously having found Prather's presence during this same incident to be indicative of her involvement in the conspiracy, although neither could be directly identified as the source of the cocaine. As we have repeatedly pointed out, however, the significance to be placed upon presence or association is largely a function of the "totality of the circumstances." *E.G. United States v. Blasco,* 702 F.2d 1315, 1332 (11th Cir.), *cert. denied,* 464 U.S. 914, 104 S.Ct. 276, 78 L.Ed.2d 256 (1983). As to Jenkins, as we have described, the lack of other competent evidence is such that to in any way attribute her as being involved in the cocaine conspiracy from the Miami incident would be to attach guilt based purely upon "mere presence." As to Prather, however, there was other significant evidence of her complicity, not the least of which was Wells' identification of her as being one source of cocaine. Under such circumstances, we perceive her presence during the exchange of cocaine in Miami to be extremely significant and probative of guilt beyond "mere presence." Therefore, there is no inconsistency in drawing different conclusions as to this evidence as to Jenkins and Prather.

not based on any personal knowledge of what transpired, but sheer presumption and conjecture. [Tr. 667]. And last, there was testimony presented linking telephone calls between Jenkins' telephone number and various numbers attributed to other parties in this case. [Tr. 745, 748, 750–51].

We view the evidence mounted against appellant Jenkins to be based upon unreliable hearsay, mere presence, and assumption based upon no personal knowledge. It is axiomatic, of course, that mere presence at the scene of a crime is not a sufficient basis upon which to base a finding of guilt. *E.G. United States v. Reyes,* 595 F.2d 275, 280 (5th Cir.1979). Nor may guilt be assumed solely through close association between persons or through family relationships. *United States v. White,* 569 F.2d 263, 268 (5th Cir.), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 149 (1976). Significantly, we note that unlike her co-defendants, there were no co-conspirator statements offered or admitted at trial implicating Jenkins in the conspiracy. We further note the disparity of the weight of the evidence as between Ms. Jenkins and her mother, appellant Prather, the so-called "connect from Miami," and the likelihood that this jury was unable to recognize the lack of evidence presented as to solely this appellant. In light of these factors, we find the conclusion inescapable that a reasonable jury could not have found that Jenkins knowingly and willingly participated in this drug conspiracy beyond a reasonable doubt. Appellant Jenkins' conviction must therefore be reversed based upon insufficiency of the evidence.

## THE VARIANCE ISSUE

The indictment in this case, as described above, characterizes the drug activities of the appellants as constituting a single conspiracy. Each appellant disputes this characterization and argues that the evidence actually shows several distinct conspiracies. Quarterman and Prather contend that this situation establishes a variance between the indictment and the proof, which in essence is one form of challenge to the sufficiency of the evidence.

The law applicable to such variance contentions in a drug conspiracy case is clear and has been set out in depth recently by this circuit in *United States v. Cole,* 755 F.2d 748, 764 (11th Cir.1985). We need not expand upon that comprehensive discussion, which states in part:

[W]here the evidence at trial proves the existence of multiple, independent conspiracies and the indictment alleges a single conspiracy, reversal of the defendant's conspiracy conviction is warranted, if the defendant's substantial rights have been injured by the variance.... In determining whether a reasonable trier of fact could have found beyond a reasonable doubt that a single conspiracy existed, we consider three factors: (1) whether a common goal existed; (2) the nature of the criminal scheme; and (3) the overlapping of the participants in the various dealings of the conspiracy.... This court will not reverse a jury's finding that a single conspiracy existed unless the evidence, viewed in the light most favorable to the government, could not permit reasonable jurors to have found, beyond a reasonable doubt, that a single conspiracy existed.

*Id.* at 764 (citations omitted). Having examined the record in full in light of this standard, we find that a reasonable jury could have concluded that the appellants participated in a single, extended conspiracy to distribute cocaine in the Atlanta area.

The appellants essentially attempt to carve this case into separate geographic conspiracies centered in Philadelphia, Atlanta, Jacksonville and Miami, based upon the contention that some of the co-conspirators did not know each other or did not have extensive contacts, and that these separate conspiracies were improperly intermingled by the government because of the membership of Murphy and Ingram in each. We note, however, that a participant in a conspiracy need not be privy to all of the details of a conspiracy, or aware of all

other participants, or even participate in each stage of the conspiracy, so long as the conspirator intentionally joined the common purpose to violate the law. *See United States v. Brito*, 721 F.2d 743, 747 (11th Cir.1983). There is no doubt that Murphy and Ingram were the cornerstones tying all aspects of the charged conspiracy together. Yet there is additional evidence from which the jury could link the other participants to one overall, cohesive conspiracy, in addition to the presence of Murphy and Ingram in most aspects of the case.

Although the following examples are not exclusive, we first note that both Ingram and Wells implicated "Ali," the Philadelphia source, with other members of the conspiracy. [Tr. 67, 217]. Second, Prather was directly implicated in Atlanta dealings by Wells, as well as in Jacksonville by Atlanta dealings by Wells, as well as in Jacksonville by Pool, with the latter testifying to the contraband being earmarked for Atlanta distribution. [Tr. 630]. Third, the telephone toll records indicate continuous contact and interaction between the actors in this case, and there are other indications of association between these parties in the Atlanta area, most particularly frequenting the ranch. And finally, we note that Ingram recounted the very nature and relationship between the actors in this case and their common objective: "[W]e were a group of people with the combined knowledge and purpose of distributing drugs without any one individual giving directions." [Tr. 146].

Admittedly, the evidence in this case could be construed to indicate multiple conspiracies, and had the government indicted based upon different conspiracies, we are certain that the defendants would have contended that one central conspiracy had been improperly split into distinct conspira-

cies. Yet the determination of whether there was one conspiracy is to be left for the jury, and as the *Brito* court noted, the scope of our review of that jury determination is narrow. 721 F.2d at 747. Viewing the evidence in a light most favorable to the government, we believe that a reasonable jury could have found beyond a reasonable doubt a single conspiracy to distribute cocaine in the Atlanta area, as did this jury, and we therefore find no basis upon which to disturb that finding.

■ Even were we to find that separate conspiracies had been established, *Brito* and *Cole* counsel that reversal is mandated only where the variance between the indictment and the evidence adversely affected an individual defendant's substantial rights. *Cole*, 755 F.2d at 765; *Brito*, 721 F.2d at 748. One important factor in this regard is the number of defendants tried and the number of conspiracies proven, the more of each indicating a greater potential for prejudice. *United States v. Solomon*, 686 F.2d 863, 870–71 (11th Cir.1982). Here, the appellants point to no specific prejudice other than general detriment from being tried *en masse.* There were eight defendants tried, six of whom were convicted. Furthermore, we perceive only two potential conspiracies emanating from the evidence as to these appellants—a Philadelphia-based group and a Miami-based group. We see no reason why the jury could not have been able to segregate the evidence applicable to each appellant between these two factual circumstances. In the absence of any other specific prejudice, we find no basis for reversal.[6]

CONCLUSION

We find the evidence sufficient to support the conspiracy convictions of appel-

---

**6.** We also note that some of the appellants raise the variance issue in the form of improper joinder under Fed.R.Crim.P. 8(b) and failure to grant a severance under Rule 14. In light of our previous findings that evidence of a single conspiracy was in fact presented, and that the appellants have demonstrated no prejudice even were it not, we find no basis for relief under either of these theories. *See, e.g., United States*

*v. Grassi*, 616 F.2d 1295, 1302 (5th Cir.) (joinder under Rule 8(b) is determined from the indictment, and if a single conspiracy is alleged, there can be no inherent prejudice; severance then becomes a matter of Rule 14, which is discretionary, and the denial of a request for severance is reviewable only for an abuse of discretion), *cert. denied,* 449 U.S. 956, 101 S.Ct. 363, 66 L.Ed.2d 956 (1980).

**618**

lants Quarterman, Prather and McTeer. Furthermore, as to those appellants, we find no variance in the conspiracy alleged and the proof at trial, nor any other viable attacks on their convictions. The convictions of appellants Quarterman, Prather and McTeer are affirmed. As to appellant Jenkins, however, we find the evidence insufficient to support her conviction. Accordingly, her conviction is reversed.

AFFIRMED IN PART, and REVERSED IN PART.