[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
December 12, 2005
THOMAS K. KAHN
CLERK

_____

No. 05-11263
Non-Argument Calendar

_____

D. C. Docket No. 03-00069-CR-WCO-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROY DAVID QUEEN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(December 12, 2005)

Before ANDERSON, BIRCH and FAY, Circuit Judges.

PER CURIAM:

Roy David Queen appeals his convictions and 33-month concurrent

sentences for possessing an unregistered firearm and making a firearm, violations

of 26 U.S.C. §§ 5841, 5861(d) and 26 U.S.C. §§ 5822, 5861(f), respectively. On appeal he argues that there was a material variance between the allegations in the indictment and the proof at trial, and argues that the district court misapprehended its legal authority to grant a sentencing departure on the basis of his pretrial state custody. For the reasons set forth more fully below, we affirm the convictions and the sentences.

A federal grand jury indicted Queen, alleging that on or about July 1, 2003, Queen (1) knowingly possessed an unregistered firearm in the form of a homemade silencer (Count 1), and (2) made a firearm in the form of a homemade silencer (Count 2). Queen pleaded not guilty and proceeded to trial, where a jury convicted him on both counts.

At trial, the government called ATF Agent Charles Lewis, who was present at Queen's residence on July 1, 2003. Lewis testified that, on July 1, he and Chief Deputy Andy Key performed a "welfare check" in response to a complaint of drug possession and usage at Queen's residence. Upon arrival at Queen's residence, Lewis and Key explained that they were police officers responding to a complaint of drug usage, and requested and received from Queen and a co-resident written consent to search the residence. Lewis spoke to Queen, and asked if he had any weapons, to which Queen replied that he did, and Lewis accompanied Queen to

2

Queen's bedroom, where Queen retrieved a firearm from a closet. Lewis seized the firearm, and noticed that the overall length appeared to have been shortened and a silencer was on the barrel. The firearm was identified for the jury. The ATF then took the weapon into custody, and Queen was transported to a detention center for questioning.

Two days after Queen's arrest, Queen signed a written waiver of his Miranda rights and was interviewed. Based on Queen's testimony at that interview, Lewis wrote out a statement that Queen reviewed, initialed at the beginning and end to prevent alteration, and signed. The substance of the statement was that, on July 1, 2003, Queen retrieved a .22 caliber semi-automatic firearm with a silencer that belonged to him and no one else. Lewis admitted that he may have given the impression that, between himself and Deputy Key, he was the nice guy and that Queen should talk with him, and he further stated that Queen's girlfriend, Shannon McArthur, who was present at the residence, became visibly upset during the search. Lewis denied telling Queen that McArthur would be released if Queen took responsibility for everything in the trailer, but Lewis recalled Queen saying to McArthur that things would be alright because he had claimed everything, and she would be let go.

Chief Deputy Key, also present during the search of Queen's residence,

testified that he and Lewis went to Queen's residence to check on the welfare status of McArthur, received consent to search the residence and asked for and discovered that Queen had a firearm in his bedroom. McArthur was later released to the custody of her mother and not charged with any crime. Key admitted that McArthur's mother was a fellow deputy and friend.

Next, the government called ATF Agent Paul Gray, who was contacted on July 3, 2003, to provide assistance to Agent Lewis. Gray then met with Lewis on July 7, and sent the firearm in question to a firearms technology branch for testing. After speaking with Lewis, Gray went to interview Queen and, after reading Queen his Miranda rights and securing a written waiver, secured a statement in Queen's handwriting. In the statement, Queen said that he purchased a partially finished silencer at the end of May 2003, and later obtained the firearm. Queen, with the help of some magazine pages, finished the silencer, and shot the firearm one time. Believing that the report was too loud, Queen bored holes in the barrel and "repacked the cylinder," but did not fire the weapon again. Gray requested that Queen clarify in his statement to whom the weapons belonged, and Queen's statement reflected that McArthur had nothing to do with the weapons. The statement was signed and dated July 7, 2003. Lastly, Gray received a certified form from the National Firearms Registry showing that Queen was not licensed to

manufacture or possess a silencer, and that the weapon in question was not registered to anyone. Later, expert testimony confirmed that the cylindrical device on the gun was capable of reducing the gun's report within the range of a homemade silencer.

The defense called Sharon Staton, who met Queen in Fall 2002, and testified that she lived in a trailer directly across from Queen's, and stated that Queen, as well as another man, David McClure, lived in that trailer. On at least one occasion, Staton had seen McClure carrying and cleaning a gun, as well as looking through its scope, but had never seen Queen carrying, cleaning, taking apart, or shooting a similar gun. However, Staton conceded that she had no knowledge of the things Queen kept in his bedroom closet.

The defense also called Robert Six, who lived across the street from Queen and McClure. Six identified the firearm at issue in this case, and stated that he had seen McClure drilling holes in the bottom of the silencer to set it up on a pair of legs. Six saw McClure cleaning the weapon and playing with it, and he testified that he had never seen Queen in possession of the gun. Six admitted that he had not seen McClure making the silencer on the weapon, nor did he know who had made the silencer.

Lastly, the defense called Queen to the stand. He testified that, shortly

before July 1, 2003, he moved into the trailer with McClure, sleeping in a room filled with McClure's tools. Queen testified that the firearm and silencer were not his, but McClure's, and that he had seen McClure with the weapon "all the time." Queen admitted firing the gun on one occasion in the middle of June. He further stated that he had seen McClure put "chore boy [which is like copper scrubber pads] and SOS pads" into the silencer to silence it and muffle the sound. McClure drilled holes into the barrel of the gun, and Queen never assisted him with anything related to the silencer.

Queen testified that, on July 1, as part of the officers' search, they wanted to conduct a urinalysis on McArthur, and McArthur began crying because she knew she would test positive. The officers told Queen that, if he made a statement to them, McArthur would be released with no charges, and Queen relayed this information to McArthur.

Later that day, Queen was asked to sign a statement written out by Lewis, and Queen did so, believing that they were letting McArthur go home in exchange. However, Queen testified that the contents of his statement were untrue. As to the statement made to Agent Gray, Queen testified that he only wrote it because he believed that he had to claim ownership of everything found in the bedroom in order to ensure that McArthur was released and, therefore, he was just telling the

6

agent what he wanted to hear. Two months later, however, he contacted his mother and wanted her to tell investigators the truth about the firearm because he had discovered that McArthur was going to be released regardless of his actions and guilty plea. Finally, Queen testified that neither the silencer nor the rifle was his, as they belonged to McClure. Queen stated that he lied in the statements he gave to police, and specifically stated that he had made up certain facts in the statement given to Agent Gray.

With respect to the statement given to Gray, Queen testified that he was aware that Gray did not work for either the sheriff's department employing Deputy Key or the drug task force for which Lewis worked, but did not tell Gray that he had given a false statement under coercion.

Prior to the closing statements, Queen objected to the government arguing that Queen possessed the firearm in question on separate occasions other than the July 1, 2003, date listed in the indictment, stating that it was a fatal variance and, furthermore, the government had failed to establish time or place or that the event even happened in the Northern District of Georgia. No ruling was made at that time.

In its closing, the government argued that the jury had more evidence that Queen possessed the firearm than just his statements to the police because Queen

had testified to possessing and firing the weapon with the silencer on it. It further argued that Queen's attempts to pin the firearm on McClure were irrelevant because, under constructive or joint possession, Queen merely had to have access to the firearm and the intent to possess it.

The government further pointed out that Queen could have told Gray, who was not connected to Lewis or Key, that he was being pressured into admitting to a crime he did not commit, but instead, wrote out a highly specific statement that Queen later declared was a lie.

Queen argued in his closing that Gray's testimony was irrelevant because he was not present on July 1, 2003, when Key and Lewis went to Queen's residence and questioned him. Queen then argued to the jury that the government could not rely on his admission that he fired the gun on one occasion because the government had presented no evidence to prove when or where Queen test-fired the weapon. He stated that the government's attempt to rely on that demonstrated the weakness of its case against him.

In response, the government told the jury that it did not have to prove that Queen possessed the weapon on July 1, but within a reasonable time period close to July 1 and, furthermore, Queen's statements indicated that he had possession of the weapon since May and altered the silencer afterward to make it more fully functional.

The court then instructed the jury that it must consider all the evidence and, in deciding what evidence was true, it could believe or disbelieve any witness. It was further instructed that any evidence of a statement given by a defendant following his arrest should be considered with caution and only after evaluating all of the circumstances under which the statement was made. As to possession, the jury was instructed regarding both actual and constructive possession, and was told that a "person who is not in actual possession but has both the power and the intention to later take control over something, either alone or together with someone else, is in constructive possession of it."

After the jury had left the courtroom, Queen, in order to preserve his objection, argued that the government's closing argument constituted a constructive amendment to the indictment and that it could not prove that Queen's possession of the firearm occurred within the statute of limitations. The court overruled the objection, finding that there was no prejudice in the government's closing. The jury subsequently convicted Queen on both counts in the indictment.

A presentence investigation report grouped the two counts of conviction under U.S.S.G. § 3D1.2, and set Queen's base offense level at 18, pursuant to U.S.S.G. § 2K2.1(a)(5). A two-level enhancement was added for obstruction of justice based on Queen's trial testimony denying the statements he made to police. No further adjustments were made, providing a total offense level of 20. Queen's

9

criminal history category was I, which at offense level 20, provided for a sentencing range of 33-41 months' imprisonment.

Queen indicated that he would be seeking a downward departure due to a reduced mental capacity and because the circumstances of his firearm possession rested outside the heartland of cases involving firearm possession. Queen also filed a motion to declare the Federal Sentencing Guidelines unconstitutional in light of Blakely v. Washington, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). Prior to sentencing, the Supreme Court issued its opinion in United States v. Booker, 543 U.S. ___, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and the district court then granted Queen's motion to the extent it was consistent with Booker and would sentence Queen in compliance with Booker.

At sentencing, Queen's objections were overruled, and the court adopted the findings and calculations in the PSI. Queen then requested that the district court sentence him to time served, as he had been in state custody since July 3, 2003, and had received no credit for that time against any federal sentence that might be imposed. At the time of his federal sentencing on February 24, 2005, Queen had been denied bond in state court and was awaiting the disposition of state charges and, according to Queen, the state court was awaiting the federal sentence before electing to proceed. Thus, the problem, as perceived by both the court and Queen, was that although the state court had indicated that it was inclined to impose a

concurrent state sentence, the practical effect was that he would serve his state sentence in state custody before beginning his federal sentence in federal custody, inadvertently causing Queen to serve consecutive sentences.

The district court stated that it understood the dilemma, but that "it's not one that can be solved from this end. It's got to be solved from that end." Queen then argued that his request for a departure was based on his history and the nature of the offense, and went on to describe his traumatic childhood, emotional and psychological problems, suicide attempts, drug abuse, and lack of proper treatment while in state custody. He then argued that, given his background and the nature of the offenses, possession of an illegal firearm in federal court and drug charges in state court, time served in state custody was a sufficient punishment for the instant offenses. Thus, Queen asked the court, whether through a downward departure or imposition of a reasonable sentence, to impose a sentence of time served. The government did not oppose giving Queen credit for time already served, but did not recommend or suggest a way to accomplish it.

The district court then stated that it would not grant Queen's request "because I don't think that's the way to approach it, and I don't think there is any sentence served to order it sentenced to time served. . . . [T]here is no time to be served." The court further stated that it would sentence Queen in the way it believed appropriate at that time, and that, while it realized that the subsequent

11

state sentencing would cause problems, it would make whatever recommendations possible to ensure that any state sentence be imposed to run concurrently with the federal one. Until the state court imposed a sentence, however, the district court felt constrained to sentence Queen on the basis of his federal offense, which it believed was more serious than the state offense. The court then imposed a sentence of 33 months' imprisonment on each count to run concurrently. Queen had no objections other than the ones made as to acceptance of responsibility and obstruction of justice.

## I. Material Variance

On appeal, Queen first argues that a material variance occurred in this case. Specifically, Queen argues that the indictment alleged that he made and possessed an unregistered silencer on or about July 1, 2003, but Queen's trial testimony, indicating that he had fired the weapon sometime in June 2003 at some unspecified location, compelled him to defend against a theory of constructive possession based on a different set of facts than those in the indictment. He argues that the government improperly relied on a theory that he could be convicted for the brief possession of the firearm on an unspecified date in an unidentified location that may not even have been in the Northern District of Georgia, causing him substantial prejudice.

"The standard of review for whether there is a material variance between the

12

allegations in the indictment and the facts established at trial is twofold: First, whether a material variance did occur, and, second, whether the defendant suffered substantial prejudice as a result." United States v. Chastain, 198 F.3d 1338, 1349 (11th Cir. 1999).

We have characterized the issue of variance between indictment and proof as "one form of challenge to the sufficiency of the evidence." United States v. Jenkins, 779 F.2d 606, 616 (11th Cir. 1986). "[A] variance exists where the evidence at trial proves facts different from those alleged in the indictment, as opposed to facts which, although not specifically mentioned in the indictment, are entirely consistent with its allegations." United States v. Gold, 743 F.2d 800, 813 (11th Cir. 1984). In order to show substantial prejudice from a material variance, a defendant must, inter alia, show that "the proof at trial differed so greatly from the charges that [he] was unfairly surprised and was unable to prepare an adequate defense." United States v. Alred, 144 F.3d 1405, 1415 (11th Cir. 1998).

Here, the indictment alleged that, on or about July 1, 2003, Queen made and possessed a firearm, in this case a silencer. The proof at trial, as submitted by the government, showed that, on July 1, 2003, Agent Lewis and Deputy Key went to Queen's residence, and received consent to search the premises in response to a drug complaint. When asked if there were any weapons, Queen responded that there were, and led Lewis to his bedroom, where a firearm with a silencer was

13

taken from Queen's closet. Two days after his arrest, Queen gave an oral statement that Lewis put into writing and Queen signed as true, indicating that Queen was the owner of the seized firearm and silencer. Several days later, Queen wrote out a statement to Agent Gray stating that Queen purchased the silencer at the end of May 2003, later obtained the firearm, finished the silencer with the help of some magazine pages, and test-fired the weapon. Because the noise was still too loud, Queen bored holes in the barrel and "repacked the cylinder," but did not fire the weapon again. Queen was not registered to either make or possess a silencer. Finally, an expert witness testified that holes had been drilled into the barrel of the gun, the cylinder contained steel wool and copper filings, consistent with silencer design, and the silencer reduced the "report," or noise of the firearm by 10.7 decibels when fired. Accordingly, the government's evidence supported the charges in the indictment.

Queen's objection appears to be that, at some point in June 2003, by his own testimony, he possessed the firearm in question, with the silencer, and fired it, but that he was unaware that he would be compelled to defend against the government's argument that this one-time incident of possession, at an undisclosed and unproven location, was proof of his criminal liability. First, this evidence was Queen's testimony and, therefore, he could not have been surprised that the government would hold him accountable for it. Second, Queen argued to the jury

14

that it could not rely on his admission of firing the weapon on one occasion because the government had not proven when or where the incident took place. Third the jury was instructed, without objection, that Queen could be found to have been in possession of the firearm if he had both the power and the intention to take control over it.

Accordingly, Queen has failed to show that the proof at trial differed so greatly from the charges that he was a victim of unfair surprise and unable to prepare a defense because (1) the indictment clearly set forth the charges; (2) the objectionable evidence was Queen's own testimony; (3) the government provided adequate evidence to prove its case; and (4) Queen argued his concern to the jury, which was properly instructed. Furthermore, there was nothing inconsistent with the government arguing that Queen had possessed the firearm on a particular instance in June 2003, even in an unknown location. The indictment charged possession "on or about" July 1, 2003, and the general rule is that "the verdict stands if the evidence is sufficient with respect to any one of the acts charged." United States v. Rivera, 77 F.3d 1348, 1351 (11th Cir. 1996). While Queen tried to "take back" his statements to police and explain away the events of July 1, 2003, the government provided sufficient evidence to support his conviction for the

15

crime in the Northern District of Georgia.[1]

In sum, while it does not appear that the proof at trial differed in any material sense from the charges in the indictment, we conclude that Queen has failed to prove any substantial prejudice and, therefore, cannot prevail under his theory of a material variance between the charges in the indictment and the proof at trial.[2]

## II. Sentencing Departures and Booker

Next, Queen argues that the district court erroneously believed it lacked the legal authority to downwardly depart or impose a sentence beneath the applicable guidelines range, especially in light of United States v. Booker, 543 U.S. ___, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). He argues that, because the guidelines do not take account of pre-trial detention that has not resulted in an undischarged

---

[1] As noted above, a material variance argument is considered a form of challenging the sufficiency of the evidence. The government's evidence was sufficient to support the charge in the indictment and secure a conviction. While Queen testified that his statements to police were untrue because he was protecting McArthur and coerced, the jury heard this testimony and his argument and was free to reject it, which, apparently, it did, as his statements to police were the only evidence that Queen made the silencer as well as possessed it. As credibility determinations are the province of the jury, the evidence in this case was sufficient to support the conviction. See United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997) ("[c]redibility determinations are the exclusive province of the jury.").

[2] It is noted that "a variance between the dates alleged and the dates proved at trial generally will not trigger reversal provided that the date proved falls within the statute of limitations and before the date of the indictment." United States v. Young, 39 F.3d 1561, 1567 (11th Cir. 1994). Queen does not argue that the June 2003 possession and firing of the firearm at issue falls outside the statute of limitations. Accordingly, the issue is deemed waived. See United States v. Silvestri, 409 F.3d 1311, 1338 n. 18 (11th Cir. 2005) (noting that issues not raised in the initial brief are waived).

sentence, the district court was legally empowered to do so or, in the alternative, to do so as part of a reasonable sentence.[3]  Queen argues that the court held to proposition that a reduction through credit for time served while in state custody could not be legally accomplished.

We have held that Booker's reasonableness standard is not applied to each individual decision, but rather to the final sentence only.  United States v. Winingear, 422 F.3d 1241, 1245 (11th Cir. 2005).  Decisions regarding guideline calculations are reviewed separately and, therefore, the district court's decision not to depart is a preliminary application of the guidelines.  Id.  Post-Booker, we have continued to hold that we lack jurisdiction to review the district court's decision not to downwardly depart so long as the court did not incorrectly believe that it lacked the authority to apply a departure.  Id.

Pursuant to the Supreme Court's instructions in Booker, we review a district court's final sentence, imposed after consulting the guidelines and considering the factors set forth at § 3553(a), for reasonableness.  Booker, 543 U.S. at ___, 125 S.Ct. at 767; see also Winingear, 422 F.3d at 1244 ("[a]fter the district court has accurately calculated the Guideline range, it 'may impose a more severe or more

---

[3] Queen does not argue, and, in fact, did not appear to pursue in the district court, that he should have been granted a downward departure for either diminished capacity or having a case outside of the heartland.  Thus, the issues are deemed abandoned.  See United States v. Day, 405 F.3d 1293, 1294 n.1 (11th Cir. 2005) (holding that issues not timely raised in the initial brief are deemed waived or abandoned).

lenient sentence' that we review for reasonableness.") (citation omitted). Among the factors that a district court should consider are the nature and circumstances of the offense, the history and characteristics of the defendant, the need for adequate deterrence and protection of the public, the pertinent Sentencing Commission policy statements, and the need to avoid unwarranted sentencing disparities. See 18 U.S.C. § 3553(a)(1)-(7).

First, Queen's brief states that 18 U.S.C. § 3553(b) authorizes the district court to downwardly depart based upon factors not considered by the Sentencing Commission. The section to which Queen refers is § 3553(b)(1), which directs a court to impose a sentence within the calculated guideline range unless "there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission." 18 U.S.C. § 3553(b)(1). Queen, however, failed to note that the Supreme Court in Booker excised § 3553(b)(1) to remedy the unconstitutional mandatory application of the Guidelines previously required by that section. See Booker, 543 U.S. at ___, 125 S.Ct. at 764. Accordingly, § 3553(b)(1) conferred no authority on the district court to downwardly depart.

The other section cited by Queen is U.S.S.G. § 5G1.3, which provides guidance to a court when imposing a sentence on a defendant subject to an undischarged term of imprisonment. As Queen correctly notes, § 5G1.3 does not

18

contemplate or provide guidance for a situation where a defendant is in pre-trial detention, but not subject to an undischarged sentence. Likewise, the district court recognized that the Guidelines did not confer any authority to grant Queen the departure he sought.[4] Accordingly, as to this "preliminary application" of the Guidelines, we lack jurisdiction to review the merits and, in any event, there was no Guidelines authority for the departure Queen sought.

Second, Queen does not explicitly argue the reasonableness of his sentence, focusing instead on the district court's decision that it could not legally accomplish what Queen requested. He does, however, argue that a reasonable sentence would have taken into account his time served. To the extent that this is sufficient to preserve a reasonableness challenge under Booker, it cannot be said that the sentence imposed was unreasonable.

In the instant case, Queen faced a statutory maximum sentence of 120 months on each count and received concurrent 33-month sentences, nearly 1/4 of the possible maximum sentence. See 26 U.S.C. § 5871; Winingear, 422 F.3d at 1246 (holding that a sentence one-tenth of the 20-year statutory maximum was

---

[4] It is, however, noted that the district court misconstrued its ability to order that Queen's federal sentence be concurrent with his future, as yet unimposed, state sentence. See United States v. McDaniel, 338 F.3d 1287, 1288 (11th Cir. 2003) (holding that "a district court does have the authority to make a federal sentence concurrent to a state sentence not yet imposed for pending state charges."). Queen, however, is not arguing for a concurrent sentence, but for a departure based upon time served, which the Guidelines do not permit. Thus, as to the question of misapprehending its authority to depart, the district court was correct.

19

reasonable). The court believed that this sentence was an appropriate one considering the nature of the federal crime committed. While, under Booker, the court could have taken Queen's state custody into consideration, it chose not to do so, and the resulting sentence was not unreasonable solely because it failed to credit that time.

Lastly, Queen's argument that the district court "firmly held to the proposition that any reduction through a credit for state custody could not be legally accomplished" warrants some discussion. While his brief does not make this argument clear, it appears that Queen could be arguing that the district court misapprehended its authority under Booker to impose a sentence outside of the advisory guideline range, notwithstanding any authority under the guidelines to grant a departure. We have not issued any opinions on a case in which the district court, despite having had the authority to impose a sentence outside the guideline range under Booker, misapprehends that authority. However, to the extent Queen is making this argument, it appears unnecessary to address that issue, as it was not properly preserved and no plain error occurred.

First, Queen filed a motion to declare the Federal Sentencing Guidelines unconstitutional in light of Blakely, which the district court granted to the extent required by Booker. The court further declared that it would sentence Queen in accordance with Booker. At sentencing, Queen never objected or indicated to the

20

district court that it was misapprehending its authority, in light of Booker, to impose a sentence outside of the guidelines range and, in fact, appeared to request only that the court grant a downward departure of 33 months if it felt inclined to impose a sentence within the guidelines range. In the alternative, he asked that the court consider his circumstances and adjust his sentence as necessary to make it reasonable. Nowhere, however, did Queen object on grounds that the district court was misapplying Booker or misapprehending its authority to impose a sentence outside the correctly calculated guideline range. Furthermore, Queen never objected that his sentence was unreasonable, even after the court had imposed the sentence and Queen was given an opportunity to object.

Accordingly, this Court reviews for plain error only. See United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.), cert. denied 125 S.Ct. 2935 (2005) (holding that a defendant's failure to object to his sentence on Sixth Amendment grounds meant that this Court would review only for plain error). "An appellate court may not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects substantial rights." Id. (quotation and citation omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id.

It is noted that the district court in this case understood Queen's dilemma, i.e., that he had been in state custody awaiting a pending state sentence on drug charges, but was receiving no credit for "time served" on his present federal sentence. (R4 at 242, 245). However, the court, while acknowledging the problem, found that "it's not one that can be solved from this end. It's got to be solved from [the state's] end," a statement with which Queen's attorney agreed. The court further perceived another problem with Queen's request that he be sentenced to "time served" - that at the time of his federal sentencing, Queen had not yet received any state sentence and, therefore, had not actually served any time for the conviction of a crime. That being the case, the court believed that it was inappropriate for it to impose a sentence in the way Queen requested, first because there was no time served with which to credit him, and second, because there was no prior sentence to which it could make Queen's federal sentence concurrent.

To the extent that the district court failed to recognize its ability to impose a reasonable sentence that would have credited Queen for the time he was held in state custody, whether or not an actual sentence had been imposed, the court arguably committed an error by misapprehending its Booker authority to sentence outside the guidelines range. However, it is not clear that the error was obvious or plain, as there is no case law or statute to indicate that the failure to grant a departure or apply a variance based on time spent in state custody was an

22

unreasonable imposition of a sentence. Furthermore, as noted above, the district court sentenced Queen "in the way that in my opinion [he] should appropriately be sentenced." Those sentences were not unreasonable as imposed, and, therefore, Queen's substantial rights were not violated by any error the district court arguably committed. Queen cannot, therefore, satisfy plain error review. Accordingly, we affirm Queen's convictions and sentences.

**AFFIRMED.**